ZURN INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 81–7219, 81–7331.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 7, 1982.

Decided July 2, 1982.

Rehearing and Rehearing En Banc Denied Oct. 8, 1982.

William B. Moore, Ferguson & Burdell, Seattle, Wash., for petitioner.

Lawrence Blatnik, N. L. R. B., Washington, D. C., argued, for respondent; Andrew F. Tranovich, N. L. R. B., Washington, D. C., on brief.

Before HUG and SKOPIL, Circuit Judges, and SCHWARZER,* District Judge.

SCHWARZER, District Judge:

Petitioner, Zurn Industries, Inc. (Zurn), appeals from a decision of the National Labor Relations Board (Board) holding that Zurn's discharge of six employees was an unfair labor practice in violation of Section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1).[1] The Board cross-appeals for enforcement of the order.

Zurn contracted with the Washington Public Power Supply System to design and construct concrete cooling towers for a nuclear power plant near Satsop, Washington. The six employees in question were Zurn's concrete placement crew ("mud crew") for the jobsite. On August 15, 1979, these employees were among those attending one of Zurn's regular weekly safety meetings. The main topic at the meeting was employee concern over Zurn's newly acquired safety skip, a device used to move injured workers. Procurement of an adequate safety skip had been a source of controversy between the workers and management for

several months. The meeting generated a heated discussion. Field Superintendent Buffington came from his adjacent office and interrupted the meeting, telling the group in an annoyed tone that he was "tired of hearing all this commotion about safety and especially about this safety skip," that dissatisfied employees should "talk to the steward about it," and that anyone who did not like that procedure could "pick up their checks."[2] The meeting broke up when Buffington finished his remarks.

After the meeting, the mud crew reported for its concrete pour for the day. On arriving at the jobsite, the men discovered that the forms were not yet finished, lacking safety handrails and ladders and fully capped rebars. The crew refused to begin the pour because the forms appeared both incomplete and unsafe. They reported the problem to the safety officer and waited for the forms to be completed, ignoring instructions from Quality Control Supervisor Lewis that Buffington wanted them to start work.[3] The crew began the pour after lunch, but met with further difficulties when several pieces of equipment, the tremie chute carrying the concrete and two of the three vibrators used to prevent separation and air pocket formation, broke down.

The forms were removed two days later, on August 17, revealing serious deficiencies in the concrete structure including rock pockets and holes. The flaws in the pour were immediately reported to jobsite super-

---

* The Honorable William W. Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

1. The act states in relevant part:

   It shall be an unfair labor practice for an employer—
   (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 (29 U.S.C. § 157)....
   
      29 U.S.C. § 157 states in relevant part:
      Employees shall have the right to self-organization, ... and to engage in other concerted activities for the purpose of ... mutual aid or protection....

2. Witnesses testified differently as to the scope of Buffington's remarks. Kissler and Wells of the mud crew and Safety Supervisor Seaman testified that Buffington expressed annoyance with employee complaints about the safety skip; crew members Stedham and Pendergrass testified that Buffington's remarks encompassed safety matters beyond the skip. Buffington was not called by Zurn as a witness, nor was he questioned about his comments at the safety meeting when called as an adverse witness by the General Counsel.

3. While the Administrative Law Judge found that there was no evidence that Buffington knew of the crew's refusal to begin work, the Board concluded otherwise.

visors. That afternoon, the entire mud crew save the foreman received termination notices. Each notice stated that the worker to whom it was issued "does not work to our satisfaction."[4] On receiving the notices, the crew members assembled at Buffington's office to protest their discharges. Although admitting the poor quality of the August 15 vibration work, they argued that the flaws were not their fault but were largely due to machine deficiencies and breakdowns. Two of them also objected that four of the workers discharged had not been engaged in any work related to vibration at the August 15 pour. Buffington told the crew that the poor quality of the August 15 vibration work was the reason for their discharges. Three employees testified that when pressed Buffington said further that an additional reason for their discharges was their complaints about safety.[5]

The crew members filed grievances with their union and unfair labor practice charges with the federal and state agencies. The Board issued a complaint against Zurn alleging violations of Section 8(a)(1) of the Act. An administrative law judge (ALJ) heard the evidence and concluded that the General Counsel had failed to prove that the crew had been discharged for engaging in the protected activity of expressing safety concerns. The Board reviewed the record *de novo* and found that Buffington's remarks at the August 15 safety meeting threatened employees with discharge for engaging in protected activities relating to job safety, and that the General Counsel had made a *prima facie* showing that the

motive for the crew's discharge was its complaints about safety. The Board went on to find that the asserted reason for the discharge based on the unsatisfactory work of the crew was a pretext, and that a violation of Section 8(a)(1) had therefore been proved.

We must enforce the Board's order if the Board correctly applied the law and if its findings are supported by substantial evidence on the record viewed as a whole. *NLRB v. Nevis Industries Inc.*, 647 F.2d 905, 908 (9th Cir. 1981). Our review therefore entails a two-step process: did the Board apply a correct rule, and does substantial evidence support its order.

## A. The Board's Standard for Causation

This case again brings before the court the recurring problem of mixed, dual or pretextual motive discharges.[6] In its recent decision in *Wright Line, a Division of Wright Line, Inc.*, 251 N.L.R.B. No. 150 (1980), the Board sought to end the confusion generated by the use of a variety of tests for gauging the lawfulness of such discharges. *See Western Exterminator Co. v. NLRB*, 565 F.2d 1114, 1118 (9th Cir. 1977). It rejected both the "in part" test, under which the General Counsel had only to show the presence of a prohibited motive, and the "dominant motive" test requiring proof that an unlawful motive was *the* motivating cause for discharge. Taking its lead from the Supreme Court's decision in *Mt. Healthy City School District Bd. of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977),[7] the Board devel-

---

**4.** There was conflicting evidence as to who made the termination decision. Project manager Stamp and Buffington testified that the decision was solely Stamp's; yet in his affidavit Buffington averred that he alone had made the decision, without consulting Stamp. There also was testimony that management offered different reasons for the discharges, one being poor vibration at the August 15 pour, and others being bad pours on August 3, 12, 15, 16, and 17.

**5.** Crew member Wells testified that Buffington referred to complaints "about the project site, about the safety skip . . . and just general complaints." Crew members Jones and Pender-

grass testified that Buffington specifically referred to employee "commotion" and "complaints" about safety.

**6.** The distinction between pretextual and dual or mixed motive discharges is irrelevant for purposes of this analysis. See, *Lippincott Industries, Inc. v. NLRB*, 661 F.2d 112, 114–15 (9th Cir. 1981).

**7.** In *Mt. Healthy*, plaintiff, an untenured school teacher, alleged that the school board's refusal to renew his contract violated his rights under the First and Fourteenth Amendments. The school board's action had been based on two

oped a two-part test.[8]  Under that test, the General Counsel has the initial burden of proving that protected activity was a substantial factor in bringing about the discharge.  Once the General Counsel has made this *prima facie* case, the burden shifts to the employer to prove, as an "affirmative defense," that the decision would have been the same in the absence of the protected activity.

This court has previously approved the *Wright Line* standard in *NLRB v. Nevis Industries, Inc., supra; see also Doug Hartley Inc. v. NLRB*, 669 F.2d 579, 580–81 (9th Cir. 1982); and *Lippincott Industries, Inc. v. NLRB, supra,* 661 F.2d at 115.[9]  Recent decisions by the First and Third Circuits raise a question, however, whether the test as formulated in *Wright Line* is entirely consistent with the Act.  *NLRB v. Wright*

grounds: (1) plaintiff's release to a radio station of an internal memorandum, which was clearly protected activity, and (2) his use of obscene language and gestures, which was not protected.  The lower courts held that since protected activity played a substantial part in the school board's decision, plaintiff was entitled to reinstatement.  The Supreme Court reversed, stating that the rule of causation used by the lower courts "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." 429 U.S. at 285, 97 S.Ct. at 575.  It went on to hold as follows:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor" —or, to put it in other words, that it was a "motivating factor" in the [school] Board's decision not to rehire him.  Respondent having carried that burden, however, the District Court should have gone on to determine whether the [school] Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

429 U.S. at 287, 97 S.Ct. at 576.

**8.** The Board stated:

> [We] shall henceforth employ the following causation test in all cases alleging violation of Section 8(a)(3) or violations of Section 8(a)(1) turning on employer motivation.  First, we shall require that the General Counsel make a *prima facie* showing sufficient to support the inference that protected conduct was a "motivating factor" in the employer's decision.  Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct.

Wright Line, A Div. of Wright Line, Inc., *supra,* 250 N.L.R.B. at 1089.

**9.** Other courts of appeal have approved the *Wright Line* rule, although the First and Third Circuit courts alone have written at length on the rule and its ramifications.

The Second Circuit has not examined the burden shifting part of the *Wright Line* rule, although it has accepted the *Wright Line* deci-

sion's definition of pretextual justification, *NLRB v. Charles Batchelder Co., Inc.,* 646 F.2d 33, 39 (2nd Cir. 1981).

The Fourth Circuit, in a recent dual motive case, found it unnecessary to decide whether the *Wright Line* rule was an appropriate one. *NLRB v. Burns Motor Freight, Inc.,* 635 F.2d 312, 315 (4th Cir. 1980).

The Fifth Circuit recited the *Wright Line* rule without comment in *NLRB v. Robin American Corporation,* 654 F.2d 1022, 1025 (5th Cir. 1981), and in *NLRB v. Charles H. McCauley Associates, Inc.,* 657 F.2d 685, 688 (5th Cir. 1981).  In *Red Ball Motor Freight, Inc. v. NLRB,* 660 F.2d 626, 627–28 (5th Cir. 1981), *cert. denied, —— U.S. ——,* 102 S.Ct. 2282, 73 L.Ed.2d 1293 (1982), it approved of the rule, rejecting without analysis an employer's challenge to the rule's burden shifting.

The Sixth Circuit specifically approved the *Wright Line* burden shifting rule in *Borel Restaurant Corporation v. NLRB,* 676 F.2d 190 (6th Cir. 1982).  The *Wright Line* rule was cited with approval in *NLRB v. Consolidated Freightways Corp.,* 651 F.2d 436, 437–38 (6th Cir. 1981), in *NLRB v. Allen's I. G. A. Foodliner,* 651 F.2d 438, 441 (6th Cir. 1981), in *NLRB v. Lloyd A. Fry Roofing Co., Inc., of Delaware,* 651 F.2d 442, 446 (6th Cir. 1981), and in *Charge Card Association v. NLRB,* 653 F.2d 272, 275 (6th Cir. 1981).

The Seventh Circuit mentioned *Wright Line* in *Sullair P. T. O., Inc. v. NLRB,* 641 F.2d 500, 504 (7th Cir. 1981), and explicitly approved the *Wright Line* rule in *Peavey Co. v. NLRB,* 648 F.2d 460, 461 (7th Cir. 1981).  *Accord, NLRB v. Eldorado Manufacturing Corporation,* 660 F.2d 1207, 1213 (9th Cir. 1981).

The Eighth Circuit approved the *Wright Line* rule and rejected the First Circuit's criticisms of the burdenshifting approach in *NLRB v. Fixtures Manufacturing Corp.,* 669 F.2d 547, 550 and n.4 (8th Cir. 1982), finding that the Board's rule was well within the latitude it should have in structuring its fact-finding process.

The Supreme Court, although aware of the conflict among the circuits, has recently declined to resolve this issue.  *Red Ball Motor Freight, Inc. v. NLRB, —— U.S. ——,* 102 S.Ct. 2282, 73 L.Ed.2d 1293 (1982) (White, J., dissenting) (denial of certiorari).

*Line, a Division of Wright Line, Inc.,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982) (enforcing the Board's *Wright Line* decision); *Behring International Inc. v. NLRB,* 675 F.2d 83, 93 Lab.Cas. (CCH) ¶ 13,392 (3rd Cir. 1982) (remanding to the Board for further consideration). *Contra, NLRB v. Fixtures Manufacturing Corp.,* 669 F.2d 547, 550 & n.4 (8th Cir. 1982) (disagreeing with First Circuit's criticisms). Specifically, the First and Third Circuit decisions approved the Board's adoption of a "but for" test patterned on the reasoning of *Mt. Healthy,* but rejected the Board's procedural framework which shifts to the employer the burden of proving good cause. Both courts expressed concern that the Board's burden-shifting approach violates Section 10(c) of the Act in two ways: by placing a burden of proof on the employer when it should be entirely on the General Counsel,[10] and by allowing the General Counsel to prevail on the strength of a *prima facie* case should the employer fail to sustain its burden of proving its affirmative defense.[11] To meet these concerns, these courts looked to the Supreme Court's decision in a Title VII discrimination case, *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), decided after the Board's *Wright Line* decision, and found the approach there taken more appropriate for mixed motive cases than the *Mt. Healthy* approach. Under *Burdine,* after the plaintiff has made a *prima facie* showing of wrongful conduct, the burden of production, not persuasion, shifts to the defendant. Once the defendant comes forward with evidence of a legitimate reason for its conduct, the burden shifts back to the plaintiff to prove that the defendant's proffered rea-

---

**10.** Section 10(c) of the Act, 29 U.S.C. § 160(c), states in relevant part:

> If upon the preponderance of the testimony taken the Board shall not be of the opinion that the person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue an order dismissing the said complaint. No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

The Board's *Wright Line* decision recognizes that the burden of persuasion should remain with the General Counsel, and attempts to resolve the apparent conflict between the *Mt. Healthy* rule and the statutory mandate with this footnote:

> It should be noted that this shifting of burdens does not undermine the established concept that the General Counsel must establish an unfair labor practice by a preponderance of the evidence. The shifting burden merely requires the employer to make out what is actually an affirmative defense ... to overcome the *prima facie* case of wrongful motive. Such a requirement does not shift the ultimate burden.

251 N.L.R.B. at 1088, n. 11.

**11.** As the court put it in *Behring*:

> The shifting burden of persuasion undermines the "but for" test and reintroduces the confusion which *Wright Line* purported to eliminate. To understand why, it is only necessary to realize that in establishing a *prima facie* case, the General Counsel need not prove that anti-union discrimination was the "real cause" of the employee's discharge. Instead, the *Wright Line* procedure only requires the General Counsel to show that anti-union animus was "a" motivating factor in the employer's decision. If the employer then proffers a legitimate reason for its action, but does not do so with enough weight to carry the burden of persuasion, the Board would rule that the § 8(a)(3) charge had been proved. This would be so despite the fact that two factors—neither outweighing the other—had been advanced as causes, and the Board never determined which was the real one. As such, the procedural aspect of the rule is plainly at odds with the "but for" test.

675 F.2d at 88.

This court's opinion in *Doug Hartley, Inc. v. NLRB, supra,* 669 F.2d at 581 (9th Cir. 1982), appeared to adopt this approach:

> Whereas previously, the General Counsel bore the burden of proving that protected union activity was the "dominant" or "moving" cause for the discharge, under *Wright Line,* and *Nevis Industries,* the General Counsel bears only the initial burden of showing that protected activity was "a motivating factor" in the discharge. The burden then shifts to the employer to prove that he would have discharged the employee absent the protected activity.

In *Doug Hartley,* however, the court denied enforcement on the ground that on the record as a whole there was not substantial evidence to support the Board's finding that the employer's reasons for the discharge were pretextual.

son was not a "true" reason for the questioned action; that burden then merges with the ultimate statutory burden of persuasion.

■ We must accept the Board's *Wright Line* rule if it is a reasonably defensible interpretation of the Act consistent with its purposes, *Ford Motor Co. v. NLRB,* 441 U.S. 488, 496–97, 99 S.Ct. 1842, 1848–49, 60 L.Ed.2d 420 (1979); *NLRB v. Local 103 International Association of Iron Workers,* 434 U.S. 335, 350–51, 98 S.Ct. 651, 660–61, 54 L.Ed.2d 586 (1978); *NLRB v. Nevis Industries, supra,* 647 F.2d at 909. Although the *Burdine* approach would be a permissible implementation of the Act's purposes, we conclude that the *Mt. Healthy* approach used in the Board's *Wright Line* decision is within the Board's authority to adopt. We find support for that conclusion in the legislative history of the 1947 amendments to the Act. While the First Circuit read that history as "inconclusive" on the issue of burden of proof, *NLRB v. Wright Line, supra,* 662 F.2d at 904, n.8,[12] the Board, and commentators, have read it as reflecting an intention to place a burden of proof on the employer. *Wright Line, a Div. of Wright Line, Inc., supra,* 251 N.L.R.B. at 1088; Brodin, *The Standard of Causation in the Mixed Motive Title VII Action: A Social Policy Perspective,* 82 Columbia L.Rev. 293, 297–98 n.6 (1982); DuRoss, *Toward Rationality in Discriminatory Discharge Cases: The Impact of Mt. Healthy Board of Education v. Doyle upon the NLRA,* 66 Georgetown L.Rev. 1109, 1123 n.69 (1978). We see no need to fathom the Congressional intent; it is sufficient for our present purposes if the history does not foreclose a legislative purpose to place on the employer the burden of proving the presence of a legitimate cause. If that is the case, then the Board's interpretation cannot be rejected. With that background, we turn to the legislative history.

The "discharge for cause" language was added to Section 10(c) by the 1947 Taft-Hartley amendments.[13] The bill introduced by Congressman Hartley and passed by the House of Representatives on April 10, 1947, had placed the burden of proving the absence of a legitimate cause for discharge on the General Counsel as follows:

No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, *unless the weight of the evidence shows that such individual was not suspended or discharged for cause.*

H.R. 3020, 80th Cong., 1st Sess. 39 (1947), *reprinted in* 1 NLRB, Legislative History of the Labor Management Relations Act of 1947 (hereinafter "Legislative History") at 31, 69 and at 158, 196 (1947) (emphasis added). The Senate amendments to the House bill omitted such a provision altogether. S. 1126, 80th Cong., 1st Sess. 28 (1947), *reprinted in* 1 Legislative History 99, 126; H.R. 3020 as passed Senate, 80th Cong., 1st Sess. 96, *reprinted in* 1 Legislative History 226, 254. A joint conference drafted a compromise version of the bill, passed by both houses of Congress in June, 1947, which deleted the "weight of the evidence" language quoted above and cast the standard in affirmative rather than negative terms:

No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, *if such individual was suspended or discharged for cause.*

H.R.Rep.No.510, 80th Cong., 1st Sess. 13 (1947), *reprinted in* 1 Legislative History 505, 517 (emphasis added). The House Conference Committee report explained these revisions as follows:

---

**12.** One judge of that court has recently asserted even more strongly that "the language of the statute as well as its legislative history seem clear . . . . These indicate quite clearly that the Board, not the employer, must bear the overall burden of showing a violation of the Act." *NLRB v. Transportation Management Corp.,* 674 F.2d 130, 93 Lab.Cas. (CCH) ¶ 13,385 (1st Cir. 1982) (Breyer, J., concurring).

**13.** See footnote 10, *supra.* The second sentence quoted was added by the 1947 amendments.

The House bill also included, in section 10(c) of the amended act, a provision forbidding the Board to order reinstatement or back pay for any employee who had been suspended or discharged unless the weight of the evidence showed that the employee was not suspended or discharged for cause. The Senate amendment contained no corresponding provision. *The conference agreement omits the "weight of evidence" language, since the Board, under the general provisions of section 10, must act on a preponderance of evidence, and simply provides that no order of the Board shall require reinstatement or back pay for any individual who was suspended or discharged for cause.* Thus employees who are discharged or suspended for interfering with other employees at work, whether or not in order to transact union business, or for engaging in activities, whether or not union activities, contrary to shop rules, or for Communist activities, or for other cause (see *Wyman-Gordon v. N.L.R.B.*, 153 Fed. (2) 480), will not be entitled to reinstatement. The effect of this provision is also discussed in connection with the discussion of section 7.

H.R.Rep.No.510, 80th Cong., 1st Sess. 55 (1947), *reprinted in* 1 Legislative History 505, 559 (emphasis added).

In the Senate debate on the conference report, Senator Pepper of Florida, who opposed the legislation, and Senator Taft of Ohio, who favored it, discussed this provision.[14] Pepper expressed concern that the employer does not like, is selected out of the crowd and discharged for violating a rule, and no one else is discharged for violating the rule, or if it can be shown that the real motivating reason which caused the employer to fire the worker was his union activities, if cause existed it would be a basis for discharge, and this provision would forbid the Board to reinstate the worker. As a practical matter, that is the effect of that language.

I now yield to the Senator from Ohio.

Mr. TAFT. I think the Senator is completely mistaken. That is not all the effect of this language. It merely states the present rule. If a man is discharged for cause, he cannot be reinstated. If he is discharged for union activity, he must be reinstated. In every case it is a question of fact for the Board to determine. *The House language provided that the burden of proof should be on the employee to show that he was not discharged for cause. The Senate conferees took the position that the question was whether he was discharged for cause, and that the burden of proving that cause should be on the employer, because the information is in his hands. So we did not accept the House provision.* All this language does is simply to say exactly what the present rule is. If the Board finds that the man was discharged for cause, that is one possible outcome. If it finds that he was discharged for union activity, that is the other outcome. The Board must determine the facts in every case. For years it has had to determine in every case whether a man was discharged for cause or for union activity. *In my opinion this language in no way changes the existing provision of law, after the modification which we forced in the House provision.*

Mr. PEPPER. Let me comment on what the able Senator from Ohio has said. If it were not

14. Mr. PEPPER. Mr. President, turning to page 34 of the conference committee print, the conference has added the following language to the Senate bill:

No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.

That looks like a very simple and innocent provision. It may seem on its face to be a very proper provision, for it appears only to give the employer the right to discharge a worker for good reason. But this is what the provision does: Under the present law a worker may be discharged by his employer for cause, but the Board may go into the real reasons for the discharge, and if the Board finds that although cause was given as the excuse, the real reason was the fact that the worker was trying to organize a union or trying to join a union, the Board may set aside the act of the employer and require the reinstatement of the worker upon that evidence. But this language allows a worker to be discharged because of union activities, although that may be only a concurrent cause of discharge.

Mr. TAFT. Mr. President, will the Senator yield?

The PRESIDING OFFICER. Does the Senator from Florida yield to the Senator from Ohio?

Mr. PEPPER. If the Senator will allow me to finish this statement, so as to make the point clear, I shall then be glad to yield.

In other words, if an employer has been allowing workers to smoke in a prohibited area, if he has been allowing workers to show up late for work, if he has been letting them quit ahead of time at the end of the day, or violate any other rules, yet if a given employee, because he has been engaged in union activities which the

conference version placed on the General Counsel the burden of proving that the employee was not discharged for cause. He pointed out that the House bill had clearly

intended to change the existing law, why was anything placed in the conference report on the subject?

Mr. TAFT. Let me say why. When we have a conference with the House and the House yields on all the major points, if the House conferees want certain language in, and the language does not do any more than state the existing law, it is a little hard to refuse to put it in. That is why we put it in. For the purpose of the RECORD, I am glad to make that statement, *because there is no intention whatever to change the existing law on this particular question.*

Mr. PEPPER. I submit the further inquiry, Why did the House put it in?

Mr. TAFT. Mr. President, will the Senator yield?

Mr. PEPPER. Everyone knows that the House was trying to write the strongest bill it could write. Why did the House put it in if it did not intend to do something to tighten up the present law?

Mr. TAFT. *When the House put it in, it wanted to shift the burden of proof to the employee. That is why it was put in.*

Mr. PEPPER. Exactly.

Mr. TAFT. We said, "We will accept this language if you will eliminate the other." Naturally the House conferees wanted to show that some of the House language was preserved. In general they accepted the entire basis of the Senate bill and the Senate language. What we did here, in effect, was to say, "If you will modify the language so that it does not change the existing law, we will accept it, and you can point to it as one of the instances in which the House language instead of the Senate language was accepted."

Mr. PEPPER. *We have an admission from the Senator from Ohio that the language was intended to mean something. It was intended to shift the burden of proof from the employer to the employee.*

Mr. TAFT. Mr. President, will the Senator yield?

Mr. PEPPER. I yield.

Mr. TAFT. *Of course, the Senator understands that that part of the House language was taken out.*

Mr. PEPPER. Yes. However, I wish to quote from the conference report, and I hope Senators will attend what I am about to quote. I suggest that the result of the conference report is to leave the interpretation of the language exactly as the House intended it. Let us see if that is correct. I read from page 55 of the conference report:

(10) The House bill also included, in section 10(c) of the amended act, a provision forbidding the Board to order reinstatement or back pay for any employee who had been suspended or discharged, unless the weight of the evi-

dence showed that the employee was not suspended or· discharged for cause. The Senate amendment contained no corresponding provision. The conference agreement omits the "weight of evidence" language, since the Board, under the general provisions of section 10, must act on a preponderance of evidence, and simply .provides that no order of the Board shall require reinstatement or back pay for any individual who was suspended or discharged for cause. Thus employees who are discharged or suspended for interfering with other employees at work, whether or not in order to transact union business, or for engaging in activities, whether or not union activities, contrary to shop rules, or for Communist activities, or for other cause (see *Wyman-Gordon v. N. L. R. B.,* 153 Fed. (2) 480 [7th Cir.] ), will not be entitled to reinstatement. The effect of this provision is also discussed in connection with the discussion of section 7.

*That shows that the Senate conferees agreed to the elimination of the words "weight of evidence," because they do not use those words which are necessary to accomplish the effect which the House sought to achieve. They say that under the rules of the Board itself the Board had to find by a preponderance of the evidence, and therefore there was not any need to put in the words of the House; but they do not disaffirm the purpose of the House, which the Senator from Ohio has acknowledged this afternoon.*

What I am saying, Mr. President, is that if an employer has a union employee of whom he wants to get rid, all he has to do is to snoop around and find him violating some rule or regulation or prohibition, and then fire him in spite of the fact that he does not fire anyone else for the same reason; in spite of the fact that the real reason for the discharge of the worker is the fact that the employer dislikes his activities with respect to the union, which may be perfectly legal under the provisions of the bill. *There, again, Mr. President, the burden of proof is shifted. In other words, instead of leaving it up to the Board to put the burden of proof on the employer, the burden of proof is put on the employee,* which makes it just a little harder for the employee to get the protection that the law was intended to afford.

Again, Mr. President, I remind the Senate that that is only one single provision of the bill, although many of them are iniquitous. It is a cumulative affair. Everywhere we turn there is a dagger or a nail or a spike to be stuck into the body of labor to make it less effective in the future than it has been in the past.

Mr. TAFT. Mr. President, will the Senator yield?

Mr. PEPPER. I yield to the Senator from Ohio.

placed that burden on the employee, i.e., the General Counsel. The conferees' deletion of the phrase "weight of the evidence," he argued, served only to eliminate a redundancy with regard to the nature of the burden of proof while preserving the House's intent with respect to its allocation. Taft, while agreeing that the original House bill did intend to shift to the General Counsel the burden of proving lack of cause, pointed out that that language had been taken out. He argued that the conference version simply left the burden of proving a legitimate cause for discharge with the employer where, according to Taft, it had always been.[15] The conference version was then adopted by the Senate.

The only other explicit mention of burden of proof allocation to be found in the legislative history is in Senator Ball's remarks urging override of President Truman's veto of the Taft-Hartley amendments. Ball, too, read Section 10(c) as preserving a preexisting rule that the employer had the burden of proving its legitimate motive for discharge:

> [There] is an explicit provision inserted in the bill in conference, *saying that if the employer proves to the satisfaction of the Board that he discharged an employee for*

Mr. TAFT. The conference report does not quite say what the Senator from Florida suggests. *The original House provision was that no order of the Board could require the reinstatement of any individual or employee who had been suspended or discharged, unless the weight of the evidence showed that such individual was not suspended or discharged for cause. In other words, it was turned around so as to put the entire burden on the employee to show he was not discharged for cause. Under provision of the conference report, the employer has to make the proof. That is the present rule and the present practice of the Board.* The Board will have to determine—and it always has—whether the discharge was for cause or for union activity, and the preponderance of the evidence will determine that question. The mere fact that there may be a little cause or real reason would not in any way lead the Board to refuse to give the employee reinstatement and back pay.

Mr. PEPPER. I do not desire to prolong the argument, because I wish to conclude. I shall have to let the matter stand on the statement of the Senator from Ohio as to the intention of the House in its original bill, what I read from the report of the conferees, and the fact that the language to which I have alluded was put in the bill at all, which certainly was intended to have some effect. Here is the importance of it. It is always a difficult matter to determine the real reason of the employer in discharging a worker. There can always be found some sort of excuse if it is desired to find one. If the employer does not give the worker the benefit of the doubt he can always wait until he smokes a cigarette 3 feet before he gets out of the door, or find some error that would constitute cause. *The provision shifts the burden of proof to make the worker show he was discharged for union activities, rather than to make the employer show that the worker was discharged for cause.*

Bear in mind, please, this provision in relation to another which I previously discussed.

That was the provision in the conference report which denies to the Board the right to consider anything the employer said in advance of the act of discharge which might have any bearing upon his reason for discharge, and keeping such statements out of evidence unless they contain not only a declaration but an actual threat, implied or expressed. Take those two provisions together, and it will be seen that they add many times to the power of the employer to discharge a worker for some reason that may be dissociated from cause or relating entirely to the exercise of the workers' rights under the law.

93 Cong.Rec. 6494, 6518–19 (1947), *reprinted in* 2 Legislative History 1565, 1593–95 (emphasis added).

15. Contrary to Senator Taft's statement, the pre-1947 decisions had in fact not been consistent. Some held that the Act placed the burden of proving a legitimate reason for discharge on the employer, *NLRB v. Entwistle Manufacturing Co.*, 120 F.2d 532, 536 (4th Cir. 1941); *see also NLRB v. Barrett Co.*, 135 F.2d 959, 962 (7th Cir. 1943) (employer bears burden of proving that strike would have taken place even if he had not refused to bargain). Some refer to an employer's burden which resembles a burden of coming forward with evidence, *see Montgomery Ward and Co. v. NLRB*, 107 F.2d 555, 560 (7th Cir. 1939). And some cases held that under the Act the employee (i.e., the General Counsel) bore the burden of proof, *see NLRB v. Union Manufacturing Co.*, 124 F.2d 332, 333 (5th Cir. 1941); *Martel Mills. Corp. v. NLRB*, 114 F.2d 624, 632 (4th Cir. 1940), *citing NLRB v. Remington Rand., Inc.*, 94 F.2d 862, 872 (2nd Cir. 1938). Whether Senator Taft's characterization of the law is technically correct or not, however, is not relevant since the issue of Congressional intent turns on the state of mind of the legislators who participated in or heard the debate.

*cause, he cannot be held guilty of an unfair-labor practice in discharging him. That is exactly the rule which the courts now require the National Labor Relations Board to follow.* In other words, if the National Labor Relations Board finds that an employer discharged an employee for cause, they cannot find him guilty of an unfair-labor practice, and it is up to the Board to make the decision.

93 Cong.Rec. 7523, 7529 (1947), *reprinted in* 2 Legislative History 1629, 1640 (emphasis added).

█ This history, although not conclusive, places a sufficient gloss on Section 10(c) to sustain the Board's *Wright Line* rule. It shows that those who successfully advocated passage of the Taft-Hartley amendments over generally pro-labor opposition did so in part at least on the strength of the argument that the burden of proving good cause for discipline would remain on the employer. The Board's rule, of course, does not relieve the General Counsel of its burden of proving an unfair labor practice by a preponderance of the evidence. See, *Wright Line, a Div. of Wright Line, Inc.,* supra, 251 N.L.R.B. at 1088, n.11 (quoted in note 10, *supra*). But it does provide a "formal framework" for establishing legitimate justification, which the Board described as follows:

> Under the *Mt. Healthy* test, the aggrieved employee is afforded protection since he or she is only required initially to show that protected activities played a role in the employer's decision. Also, the employer is provided with a formal

framework within which to establish its asserted legitimate justification. In this context, it is the employer which has "to make the proof." Under this analysis, should the employer be able to demonstrate that the discipline or other action would have occurred absent protected activities, the employee cannot justly complain if the employer's action is upheld. Similarly, if the employer cannot make the necessary showing, it should not be heard to object to the employee's being made whole because its action will have been found to have been motivated by an unlawful consideration in a manner consistent with congressional intent, Supreme Court precedent, and established Board processes.

251 N.L.R.B. at 1089.[16]

### B. *Sufficiency of the Evidence*

Having concluded that the Board applied a correct legal standard in the instant case,[17] we turn to the Board's factual findings. Our review is limited to a determination whether the Board's finding that Zurn discharged the six employees because of their safety-related actions is supported by substantial evidence on the record considered as a whole, 29 U.S.C. § 160(e); *Universal Camera Corporation v. NLRB,* 340 U.S. 474, 490–91, 71 S.Ct. 456, 465–66, 95 L.Ed. 456 (1951). The record to be considered includes the ALJ's findings, and the Board's reversal of the ALJ's decision requires that our review be more searching. *Doug Hartley, Inc. v. NLRB, supra,* 669 F.2d at 581.

---

**16.** We do not interpret the Board's reference to discipline or other action which would have occurred "absent protected activities" as implying that the employer has an additional burden to prove the absence of a causal relationship between the protected activity and the discipline. The employer's burden is limited to proving the presence of an independent legitimate ground sufficient for the disciplinary action. As the Court explained in *Mt. Healthy*:

> But that same candidate ought not to be able, by engaging in such [protected] conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the em-

ployer more certain of the correctness of its decision.

429 U.S. at 286, 97 S.Ct. at 575.

**17.** The Board's order states:

> The Board has recently stated in *Wright Line, A Division of Wright Line, Inc.,* 251 NLRB No. 150 (1980), that where the motivation for discharge is at issue, the General Counsel must make a *prima facie* showing sufficient to support an inference that protected activity by employees was a motivating factor in an employer's decision to discharge. The employer then has the burden of showing that the employees would have been discharged absent that protected activity.

The quantum of evidence required to support the Board's decision is greater when the ALJ, on the basis of the witnesses' demeanor, made credibility determinations contrary to those of the Board. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1078 (9th Cir. 1977). In *Penasquitos*, this court drew a distinction between credibility determinations based on the observed demeanor of the witnesses and inferences drawn from the evidence itself. While the ALJ's ability to observe at first hand the witnesses' demeanor entitles his credibility determinations to deference, the Board's experience and expertise require that deference be given the derivative inferences it draws from the evidence.

In this case, the Board departed from the ALJ's decision in both respects. The Board accepted the testimony of the mud crew respecting the reasons given by Buffington for the discharge which the ALJ had rejected on considerations of "demeanor and fervor." The ALJ's rejection of the testimony, however, is entitled to little deference since the testimony is unrefuted. Buffington, though available, was not called by Zurn as a witness.

The Board and the ALJ also differed on the inferences to be drawn from the evidence respecting the motive for the discharges. The ALJ found the General Counsel's interpretation of the events to be improbable, holding that Zurn's justified dissatisfaction with the admittedly poor quality of the pour fully explained the discharges. The Board, on the other hand, concluded that the conflicting explanations for the discharges given by Zurn's witnesses, the lack of involvement of some of the discharged men in the pour work, Zurn's own responsibility for inoperable equipment, the failure to discharge the responsible working foreman, and the generally satisfactory work of the crew supported the inference that the asserted reason for the discharge was a pretext. Considering the record as a whole, we conclude that there was substantial evidence to support the Board's decision.

Zurn advances several other arguments criticizing the Board's order. Zurn contends that the Department of Labor, not the NLRB, has exclusive jurisdiction over employee safety matters. This argument is without merit. The Board has jurisdiction to investigate unfair labor practices, which include discharges based on protected activity such as voicing safety complaints; that the employees may also have had other rights or remedies under the Occupational Health and Safety Act does not divest the Board of jurisdiction. *See, e.g., Whirlpool Corp. v. Marshall*, 445 U.S. 1, 17–18 n.29, 100 S.Ct. 883, 893–94 n.29, 63 L.Ed.2d 154 (1980). Zurn also argues that a grievance settlement made after the discharge should be given great weight. While private grievance and arbitration procedures are preferred methods of resolving labor disputes, the Board may in its discretion choose not to defer to such settlements if, in its judgment, the public interest would not be served by doing so. *See, Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270–71, 84 S.Ct. 401, 408–09, 11 L.Ed.2d 320 (1974). Finally, Zurn argues that Buffington's remarks are free speech protected by the First Amendment and the Act. This argument is frivolous. Neither the Constitution nor the Act are meant to shield employers from unlawfully threatening discharge.

The petition for review is denied. The Board's order is affirmed and will be enforced.