NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

BROOKS CAMERAS, INC., Respondent.

No. 80–7563.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 9, 1981.

Decided Nov. 4, 1982.

Corinna L. Metcalf, Washington, D.C., argued for petitioner; Richard B. Bader, N.L.R.B., Washington, D.C., on brief.

\* Honorable James M. Burns, Chief United States District Judge for the District of Oregon, sitting by designation.

E. Fredrick Preis, Jr., Kullman, Lang, Inman & Bee, New Orleans, La., for respondent.

Before POOLE and REINHARDT, Circuit Judges, and BURNS,\* District Judge.

POOLE, Circuit Judge.

The National Labor Relations Board (Board) petitions for enforcement, and Brooks Cameras, Inc. cross-petitions for review of a Board finding that Brooks violated section 8(a)(1), (3) and (5) of the National Labor Relations Act (Act). The Board's inquiry focused on the circumstances surrounding Brooks' interrogation of an employee and its termination of seven employees within four days of the demand for recognition by Warehouse Union Local 6.

Charles Wheeler, a Brooks warehouseman, spearheaded an effort to unionize Brooks' South San Francisco warehouse in May and June of 1978. By Friday, June 23, the union had secured authorization cards from fourteen of sixteen warehouse and service employees.[1] The following Monday, June 26, Albert Lannon, the union business agent, went to Brooks' South San Francisco facility and conveyed a message to Joseph Dee, the company president, that the union represented a majority of the warehouse employees and to request that Brooks begin negotiations. Dee refused to see Lannon. Lannon left the premises and sent a telegraph reiterating the request to negotiate. By letter the same day, Dee challenged the union's majority status and refused recognition.

On Tuesday, Jerry Jaramillo, Brooks operations manager, learned of Wheeler's role in the union organization effort. He questioned Gary Hunter, warehouse assistant manager, with respect to warehouse union activity and Wheeler's involvement.

1. The bargaining unit consisted of warehousemen and repair department personnel. Hereinafter references to "warehousemen" and "warehouse employees" will apply equally to both warehouse and service personnel.

On Wednesday, the union filed a petition with the Board.

On Thursday, a crisis occurred. That morning, Dee held an employee meeting at Brooks' main store in San Francisco. There he expressed shock and surprise that the warehousemen wanted a union. Another mandatory meeting scheduled for the South San Francisco warehouse that same morning was cancelled. Steve Lane, a cash sales auditor, apparently inspired by the warehouse union activity, informed his department manager, Mark Gottlieb, that he intended to organize the clerical workers. Gottlieb hastily consulted with Vic Richmond, Brooks vice president of finance. Shortly thereafter, Richmond summoned Lane and told him, "You put me in a terrible dilemma." He advised Lane that he was scheduled for termination the following day as part of a permanent staff reduction implemented for "economic reasons," and told him that he was now compelled to fire him immediately because the firing would appear to be in retaliation for Lane's expressed intent to organize his department if it were delayed until the following day.

Jaramillo then summoned six warehouse employees, including Wheeler, and told them that they were being terminated "for economic reasons." Two other South San Francisco employees were also discharged, as was one employee from the San Francisco warehouse. Neither Lane nor the South San Francisco warehouse employees received either advance notice or severence pay, except payment for the following day, June 30, the last day of the pay period.[2] On Friday, one warehouseman absent the previous day was given the same explanation and was also terminated.

The General Counsel commenced this action, alleging that the termination of Wheeler and other South San Francisco warehouse employees, and the interrogation of Gary Hunter, violated the Act. The administrative law judge found the interrogation of Gary Hunter to be the sole violation of the Act, and decided that a remedial order was not warranted. The Board disagreed. It found that the firings violated section 8(a)(1) and (3), that the interrogation violated section 8(a)(1) and warranted a remedial order, and that Brooks violated section 8(a)(1) and (5) by refusing to recognize and bargain with the union.

This enforcement petition raises two issues. First, is the Board's finding that the terminations constituted an unfair labor practice supported by substantial evidence in light of the administrative law judge's contrary determination? And, did the Board abuse its discretion in issuing a remedial order with respect to the unlawful interrogation? We answer both questions in the affirmative.

*The employee terminations*

The Board found that Brooks' discharge of the seven warehousemen constituted a violation of section 8(a)(1) and (3) of the Act. Section 8(a)(3) renders illegal the discharge of an employee for his protected union activity.[3] Section 8(a)(1) prohibits employer interference with an employee's right to organize and bargain collectively,[4] and a violation of (a)(1) may be predicated upon an (a)(3) violation.

Brooks argues that the disputed discharges were decided upon prior to its learning of the warehouse union activity, and were based on economic considerations. It submitted evidence before the administrative law judge that the staff reduction was in

---

**2.** Mel Weeks, the San Francisco warehouse employee that was fired at the same time, did received severance pay.

**3.** Section 8(a)(3) provides, in pertinent part:
(a) It shall be an unfair labor practice for an employer—
   *    *    *    *    *    *
(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discour-

age membership in any labor organization. . . .
29 U.S.C. § 158(a)(3).

**4.** Section 8(a)(1) provides:
(a) It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of [their right to organize and bargain collectively].

response to the company's financial difficulties.

When a discharge is motivated by both legitimate business reasons and anti-union animus, or when business reasons may be a pretext for a termination motivated by hostility toward the union, an unfair labor practice may only be found if the anti-union animus was the moving cause of the discharge. *Lippincott Industries v. NLRB,* 661 F.2d 112, 115 (9th Cir. 1981). The Board must make a showing that the union activity was a motivating factor; then the burden shifts to the employer to establish that the terminations would have occurred absent the protected union activity. *NLRB v. Nevis Industries,* 647 F.2d 905, 909 (9th Cir. 1981); *Wright Line,* 251 N.L.R.B. 1083 (1980), *enforced,* 662 F.2d 899 (1st Cir. 1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Here, the administrative law judge found that the General Counsel had made a prima facie showing that the terminations were motivated by hostility toward the warehouse employees' union activity. He concluded, however, that Brooks had established that the warehouse terminations would have occurred absent the union organization efforts. The Board reached a contrary conclusion, which we believe was within its province.

This court must uphold the factual determinations of the Board if, considering the evidence as a whole, its findings are based upon substantial evidence. *NLRB v. Anchorage Times Publishing Co.,* 637 F.2d 1359, 1363 (9th Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 137, 70 L.Ed.2d 115 (1981); *NLRB v. Big Bear Markets,* 640 F.2d 924, 928 (9th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980). When the Board and the administrative law judge make contrary findings, this standard does not change; the deference accorded fact findings runs in favor of the Board, but the administrative law judge's findings as part of the record must be weighed along with other opposing evidence, against the evidence supporting the Board's decision. *NLRB v. Tischler,* 615 F.2d 509, 511 (9th Cir. 1980); *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1076 (9th Cir. 1977).

In *Penasquitos Village, Inc. v. NLRB,* we examined at length the distinction between credibility determinations and derivative inferences, inferences drawn from the evidence. "Weight is given to the administrative law judge's determinations of credibility for the obvious reason that he or she 'sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records.'" 565 F.2d at 1078 (quoting *NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962). *See NLRB v. Tischler,* 615 F.2d at 511. However, the Board is not required to accept an employer's self-serving declarations even when credited by the administrative law judge, but may draw its own inferences, giving such statements the weight it deems appropriate. *NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1347 (9th Cir. 1978).

As to derivative inferences, our deference is to the Board and not the administrative law judge.

Board members are presumed to have broad experience and expertise in labor-management relations. *See NLRB v. Miller Redwood Co.,* 407 F.2d 1366, 1369 (9th Cir. 1969). Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute.

*Penasquitos Village, Inc. v. NLRB,* 565 F.2d at 1079. And where, as here, the central issue is the employer's motive behind an employee discharge, "we must be mindful that the determination of motive is particularly within the purview of the NLRB." *Lippincott Industries v. NLRB,* 661 F.2d at 116 (citing *Pay'n Save Corp. v. NLRB,* 641 F.2d 697, 702 (9th Cir. 1981)).

The Board and the administrative law judge correctly found that the General Counsel had established a prima facie case of unlawful discharge. The company learned of the union activity on June 26,

and the warehouse terminations—seven of sixteen employees—swiftly followed.[5] The warehouse manager, John Kretschmann, the repair department head, Michael Powers, received no advance notice of the terminations. Kretschmann, at the request of the Brooks executive committee, had prepared and submitted a warehouse reorganization plan that called for only two terminations,[6] and recommended a promotion for Wheeler to warehouse assistant manager following Hunter's anticipated departure. The staff reduction, as effected, contrasted sharply with Kretschmann's recommendations as well as personnel reductions in other departments.

The warehouse cutback was far more severe than reductions made in other areas— only three other South San Francisco employees were terminated, and no more than two from a single department. In other departments, the least productive persons were discharged, and this approach was originally planned for the warehouse reduction as well.[7]

Sometime between June 20 and the terminations on June 29, the company altered its plan with respect to the warehouse staff reduction.[8] Instead of discharging the two least effective workers, thus reflecting other department reductions in both selection and number of employees to be discharged, the seven most junior employees were terminated. This resulted in the retention of one employee recommended by Kretschmann for dismissal, and in Wheeler's discharge, despite his superior work record.[9] The selection of precisely seven employees supports an inference that Brooks was trying to get rid of Wheeler, the most senior of the terminated warehouse employees, that it could not do so on the basis of poor work performance and therefore that the warehouse staff reduction was determined on the basis of seniority. While Brooks argued that the relatively large number of employees rendered terminations on the basis of competence impractical, in fact Kretschmann had evaluated his employees' work performance in drafting his reorganization plan. Sixteen employees do not appear too cumbersome a group to be individually evaluated.

The Board introduced evidence that, contrary to Brooks' usual procedure, the discharged warehouse employees' termination forms contained no indication of eligibility for rehire. Discharged employees testified that Jaramillo told them when they were fired that they were ineligible for rehire.

▆ The administrative law judge and the Board also found that the company was strongly anti-union.[10] Anti-union animus is

---

5.  Since Hunter, John Kretschmann's assistant, was scheduled to leave the company in July, the terminations resulted in the loss of half of the warehouse staff.

6.  Kretschmann recommended that Bill Reid and John Wallace, Jr. be terminated because he considered them the least productive warehouse workers. Company officials testified that these men were discussed by the executive committee as candidates for termination, and Respondents Exhibit 10 proposed firing two warehouse personnel.

7.  This is shown by Respondent's Exhibit 10.

8.  *See* discussion *infra* at 917–918.

9.  Although Wheeler was not one of the more senior warehouse employees, Kretschmann thought well enough of him to recommend that he be given Hunter's position as Kretschmann's assistant when Hunter left Brooks in July.

10.  Dee spoke out strongly against the warehouse union in a hastily scheduled, mandatory meeting at Brooks' San Francisco warehouse on June 29. A meeting scheduled that same morning at the South San Francisco warehouse was abruptly cancelled. Dee later gave a speech to the remaining South San Francisco employees, reprinted in the *Brooks Reporter.* Both speeches aggressively stated the company's objections to the union.

Jaramillo illegally interrogated Hunter with respect to warehouse union activities, although he did so in the good faith belief that Hunter was a supervisor.

Brooks fired Lane on the very day he announced his intent to organize the clerical workers, under circumstances suggesting management panic. The General Counsel, however, did not contend that Lane's discharge was in violation of the Act. Therefore this evidence is of little probative value.

relevant to a determination that a firing was the result of employer hostility toward union activity. *See NLRB v. Inland Empire Meat Co.,* 611 F.2d 1235, 1238 (9th Cir. 1979). It does not in itself prove, however, that Brooks would intentionally employ illegal means to keep the union out of the warehouse. *See NLRB v. Best Products Co.,* 618 F.2d 70, 74 (9th Cir. 1980).

In turn, company officials attempted to show that the discharges were based on reasonable business considerations. Company officials testified that the company was experiencing financial difficulties, and that a payroll cutback had been in the works for some time and had reached the final planning stages prior to the union's recognition demand. Because the number of selling employees bore a direct correlation to company income, management decided to reduce the number of general and administrative employees.

Brooks officials established that the discharged warehouse employees were for the most part not replaced, although management trainees were used in the warehouse for the first time after the staff reduction, and one employee was transferred from the San Francisco warehouse. The company also introduced evidence that the warehouse was functioning more efficiently at the time of the hearing than prior to the warehouse terminations; but this is at least in part due to technological innovations introduced into the warehouse subsequent to June of 1978 and to the fact that the San Francisco store no longer channeled repairs through the South San Francisco warehouse.

Brooks introduced notes taken by Hunter Anderson, the vice president of personnel, of executive committee meetings. These notes disclosed discussions relating to a staff reduction, although none indicated that a personnel cut was imminent and none were of meetings close in time to the disputed terminations. Brooks officials

were vague about precisely when the specific personnel to be terminated were selected, but all agreed that the final decision was made prior to Lannon's notifying Dee of the union's majority status on June 26.

Company officials gave no explanation how precisely seven warehousemen were selected for termination. Other members of the executive committee suggested that Dee made the final decision on the personnel to be cut, although all the committee members were involved in the decision. Dee, himself, however, was quite vague, both as to the decision process and how it occurred.[11]

Jaramillo testified that Kretschmann was not told in advance of the terminations because he feared that Kretschmann would have become "very upset," but did not explain why Kretschmann would be expected to be less "upset" when presented with the terminations after the fact.

Anderson explained the dearth of notes on staff reduction discussions immediately prior to the terminations as justified by a need for secrecy.

In reaching his decision that the company had met its burden of rebutting the Board's evidence of unfair labor practices, the administrative law judge gave particular consideration to two exhibits introduced by Brooks. Exhibit 10 consisted of a list of Brooks' nonselling employees, showing a proposed staff reduction by job function. Exhibit 12 consisted of a list of the employees who were actually discharged on June 29 and 30. Exhibit 10 was undated; while the figure "6/28/78" appears on Exhibit 12. Exhibit 10 differed from Exhibit 12 in only two significant respects. Exhibit 10 did not anticipate the termination of Sydney Behrendt, Brooks personnel manager; and it proposed only two warehouse terminations, instead of the seven terminations that actually occurred. Thus, these exhibits appear

---

11. Other company officials testified that Dee made the final reduction decision. Dee's testimony, if taken literally, would not preclude a finding that the discharges violated the Act. He stated that he was concerned only with the numbers, and stated that after June 26, "the numbers did not change." He did not expressly state that the selection of personnel did not change in the aftermath of the union demand.

to support a finding that two warehousemen were originally slated for termination, and that after learning of the union on June 26, the company dramatically increased its planned warehouse cutbacks, as shown in the document dated June 28, to chill protected union activity.

Anderson testified, however, that he prepared Exhibit 10 on June 15 or 16 in preparation for the June 16 executive meeting. He testified that he prepared Exhibit 12 either on Friday, June 23, or before the 8:30 a.m. executive committee meeting on June 26. He explained that the June 28 notation reflected the date that he drew up the final paychecks of the employees slated for termination, and not the date that the list itself was prepared.

The administrative law judge's decision states:

> I ... credit the testimony of the management officials that after a series of tentative proposals were considered, the final decision as to the specific reductions was made at the [Executive Committee] meeting on June 16. It was during the course of this meeting that Anderson produced a list of the [general and administrative] employees showing the reductions by job functions rather than by identifying the employees to be terminated by name. (Respondent Exhibit No. 10). This substantiates Anderson's testimony that on June 26, the date that the Union made its request for recognition, the Executive Committee had before it a final list which reflected the decision made on June 16, and this list identified each of the employees to be terminated by name as well as job function. (Respondent Exhibit No. 12).

Since the company had decided on the employees to be discharged prior to company awareness on June 26 of union activity, the administrative law judge concluded that the warehouse employees were terminated for economic reasons, and not because of the company's anti-union animus.

The Board reversed this finding:

> We expressly reject the Administrative Law Judge's finding that the final deci-

sion as to which employees would be discharged was made at. the meeting on June 16, as well as his reliance on Resp. Exh. 10 and Anderson's accompanying testimony.... Three notations appearing on the face of Exh. 10 indicate that the exhibit could not have been prepared until sometime on or after June 20.

Brooks now concedes that Exhibit 10 could not in fact have been prepared prior to the June 16 meeting as Anderson testified. Because the preliminary reduction plan recommending two warehouse terminations was not yet in existence at the time of the June 16 meeting, a final decision as to the personnel to be discharged could not have been made at the meeting, and the administrative law judge's finding to the contrary is patently wrong.

The company nonetheless argues that the Board erred in reversing the administrative law judge's crediting of Anderson's testimony. It argues that Anderson's error in stating the date that Exhibit 10 was prepared was unimportant because the document's contents shows that it must have been prepared the week preceding the union recognition demand and the disputed discharges.

This argument misses the point. Timing is a crucial issue in this case, and the only evidence that the company has put forward indicating that the warehouse terminations were planned prior to Lannon's appearance at the South San Francisco office consists of self-serving declarations made by company officials and two documents; and the dates on which these instruments were prepared is of obvious importance. Anderson testified as to when he prepared the documents, and refuted to the examiner's satisfaction that the date appearing on Exhibit 12 was the date it was in fact prepared. It is clear from the administrative law judge's decision that he gave considerable weight to Anderson's testimony and the documents. Anderson's testimony has now been proved inaccurate in an important respect, and this inaccuracy has engendered an erroneous finding of fact by the examiner on a matter vital to the outcome of the litigation. We cannot say that the administrative law

judge would have reached the conclusion he did, had he been in possession of the true facts.

The fact that Exhibit 10 must have been prepared prior to June 26 provides only negative support for the company's position. This simply means that Exhibit 10 could have conceivably been prepared and subsequently superceded by Exhibit 12 prior to the union's demand for recognition. It does not prove that Exhibit 12 was not prepared subsequent to June 26.

Under the circumstances, and in light of all the evidence, we cannot say that the Board erred in rejecting the examiner's findings, or that its determination that the discharges were in violation of the Act was not supported by substantial evidence.

*The illegal interrogation*

■ An employer's interrogation of its employees constitutes an unfair labor practice when, under the circumstances, it reasonably tends to restrain or interfere with employee union activity. *Lippincott Industries v. NLRB,* 661 F.2d at 114; *Penasquitos Village, Inc. v. NLRB,* 565 F.2d at 1080. On Tuesday, June 27, Jerry Jaramillo approached Gary Hunter. He stated that he had heard that the warehousemen wanted a union, indicated that he knew that Charlie Wheeler was the instigator, and asked what the employees' grievances were.

At the hearing before the administrative law judge, Brooks argued that Gary Hunter was a supervisor within the meaning of the Act.[12] The administrative law judge, finding that Hunter possessed none of the statutory indicia of a supervisor, and that the interrogation was, therefore, a violation of § 8(a)(1). He recommended that no remedial order issue, however, because the interrogation was an isolated incident and minimal in effect. This recommendation was based on the fact that the company had a good faith belief that Hunter was a super-

visor, that no other employees were present, and that there was no indication that Hunter told his co-workers of the incident.

The Board agreed that the interrogation constituted an unfair labor practice. It found, however, that a remedial order was warranted because the inquiry concerned all the warehouse employees and was an attempt by the company to obtain information to "discourage or prevent by both lawful and unlawful means" the union organization efforts. Brooks argues that issuance of the remedial order was an abuse of the Board's discretion.

■ The Board's selection of a remedy for unfair labor practices is entitled to considerable deference. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939 n. 32, 23 L.Ed.2d 547 (1969); *Rayner v. NLRB,* 665 F.2d 970, 976 (9th Cir. 1982); *NLRB v. Tischler,* 615 F.2d at 512. This court's role in reviewing remedial orders issued by the Board, however, is not merely that of a "rubber stamp." *Rayner v. NLRB,* 665 F.2d at 976; *NLRB v. Tischler,* 615 F.2d at 512; *NLRB v. Chatfield-Anderson Co.,* 606 F.2d 266, 268 (9th Cir. 1979). Here, the Board does not seriously challenge the administrative law judge's finding that the interrogation was isolated and minimal. In light of the administrative law judge's determination that no remedial order was warranted, we hold that the remedial order with respect to the illegal interrogation constituted an abuse of Board discretion.

The Board's order is ENFORCED as modified.

REINHARDT, Circuit Judge, concurring in part and dissenting in part.

The majority properly defers to the NLRB's findings regarding the employee terminations. Because the Board's imposition of a remedy for the illegal interroga-

---

12. Section 2(11) of the Act provides:

The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not merely routine or clerical in nature, but requires the use of independent judgment.

tion is entitled to even greater deference, that decision should also be affirmed.

As the majority correctly notes, disagreement between the NLRB and the administrative law judge does not mean that we should treat the Board's ultimate decision with any less deference. When, as in the case at hand, the Board uses its experience and expertise to draw inferences from the evidence different from those drawn by the administrative law judge, the Board's decision must be upheld if it is supported by substantial evidence. As we recently emphasized, "[a] disagreement between the Board and the ALJ does not alter the substantial evidence standard of review. Where, as here, the Board did not reject the ALJ's credibility determinations but merely drew different inferences from the evidence, the deference accorded to the findings runs in favor of the Board, not the ALJ." *Alfred M. Lewis, Inc. v. NLRB,* 681 F.2d 1154, 1155 (9th Cir. 1982) (citations omitted). *See also Zurn Industries, Inc. v. NLRB,* 680 F.2d 683, 694 (9th Cir. 1982); *H & D, Inc. v. NLRB,* 670 F.2d 120, 122 (9th Cir. 1982); *NLRB v. Big Bear Supermarkets No. 3,* 640 F.2d 924, 928 (9th Cir.), *cert. denied,* 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980).

The NLRB's expertise is especially well-suited to the selection of remedies. Consequently, we have recently held that "[t]he Board has broad discretion in fashioning remedies to effectuate the policies of the Act in light of the circumstances of each case." *Industrial, Technical & Professional Employees Division, National Maritime Union v. NLRB,* 683 F.2d 305, 308 (9th Cir. 1982) (citation omitted). *See also NLRB v. Food Store Employees Union, Local 347,* 417 U.S. 1, 8, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1974); *East Bay Chevrolet v. NLRB,* 659 F.2d 1006, 1011 (9th Cir. 1981). The Board's choice of a remedy is thus subject to very limited judicial review. *See, e.g., Industrial, Technical & Professional Employees Division, National Maritime Union,*

683 F.2d at 308; *Rayner v. NLRB,* 665 F.2d 970, 976 (9th Cir. 1982). The Board's remedy may not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943).

Under the appropriate standard of review, then, the NLRB's imposition of a remedy for the unlawful interrogation should be upheld. Contrary to the majority's assertion, the Board vigorously disputes the administrative law judge's conclusion that the interrogation was isolated and minimal. Indeed, the Board explicitly found that although "the interrogation was addressed to only one employee, it was concerned with all warehouse employees and sought information that could be used by [Brooks] to discourage or prevent by both lawful and unlawful means the unionization of those employees." *Brooks Cameras, Inc. v. Warehouse Union Local 6,* 250 N.L.R.B. 820 (1980). As the Board emphasized, "the characterization of the interrogation as 'isolated and minimal' is not only irrelevant but also inaccurate as well." *Id.* Consequently, the Board properly found that a minimal remedy[1] was necessary to prevent the fear of similar interrogations from unlawfully discouraging union organizational efforts.

In short, the NLRB's decision to impose a remedy for the unlawful interrogation is entitled to special deference. Where, as here, the violation is supported by substantial evidence and the selection of a remedy is the result of the Board's special expertise, the Board's action should be affirmed. Under the circumstances presented in this case, there is no basis for setting aside the Board's choice of a remedy.

---

1. The Board's remedy in this case is directly proportionate to the employer's violation. The Board simply ordered that Brooks "cease and desist from ... [i]nterrogating employees con-

cerning union activities" and that Brooks post a notice of the Board's decision. *Brooks Cameras, Inc. v. Warehouse Union Local 6,* 250 N.L.R.B. 820 (1980).