785 F.2d 1431
 54 USLW 2558, 1986-1 Trade Cases 67,021
 SOUTHWEST SUNSITES, INC., Green Valley Acres, Inc., a Texas
Corporation, Green Valley Acres, Inc., II, a Texas
Corporation, Sydney Gross and Edwin
Kritzler, Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 No. 85-7182.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 9, 1985.
Decided April 1, 1986.
 
 Glenn A. Mitchell, Washington, D.C., for petitioners.
 Leslie Rice Melman, F.T.C., Washington, D.C., for respondent.
 Petition to Review an Order of the Federal Trade Commission.
 Before WRIGHT, KENNEDY and BEEZER, Circuit Judges.
 BEEZER, Circuit Judge:
 
 
 1
 Petitioners Southwest Sunsites, Inc. ("SWS"), Green Valley Acres, Inc. ("GVA"), Green Valley Acres, Inc. II ("GVA II"), Sidney Gross, and Edwin Kritzler, appeal the Federal Trade Commission's finding that their representations and failures to disclose, in connection with the sale of rural, undeveloped land, violated the Federal Trade Commission Act, 15 U.S.C. Sec. 45(a) (1982). Petitioners contend that application of a new deception standard violates their due process rights and the Administrative Procedures Act, that ex parte communications require reversal, that there is no substantial evidence to support the findings, and that the order is overly broad. We affirm.
 
 FACTS
 
 2
 Petitioners SWS, GVA, and GVA II are land sales companies incorporated in Texas with corporate headquarters in California. Petitioners are engaged in the sale of undeveloped rural land in west Texas for use as farms, ranches, homesites, and commercial uses. Sales are primarily to out-of-state purchasers. Petitioner Kritzler is the general manager of each corporation, responsible for day-to-day corporate operations and general policy decisions. Petitioner Gross and members of his family own all the stock in each corporation. Gross was the exclusive sales agent for SWS, GVA and GVA II.
 
 
 3
 Between 1973 and 1977, petitioners acquired 40,000 acres of undeveloped land in west Texas. Petitioners used both their own employees and independent brokers to sell the land. Petitioners purchased a 17,647 acre tract (Southwest Sunsites) in 1973 at about $27 per acre and sold 5, 10, and 40 acre parcels from that tract for $600.00 to $700.00 per acre. Of the 1800 parcels in the tract, between 1300 and 1595 were sold to the public. Green Valley Acres, consisting of 1200 five-acre parcels, was acquired for about $50.00 per acre in 1976 and sold for $800.00 to $1,200.00 per acre.
 
 
 4
 The land was marketed through newspaper, television and radio advertisements. Radio and television ads appeared as often as 150 times a week. Petitioners maintained sales offices in Dallas, Houston, Atlanta and, for a brief time, Boston. Staff in the Houston and Dallas offices organized promotional dinners.
 
 
 5
 Brochures produced by petitioners touted the land as a good, safe investment. Buyers were told that the land was a good investment because industrial development was likely. Oil, rubber, nuclear and uranium interests were all potential developments. Petitioners also represented the land as suitable for homesites, subsistence farms, and non-commercial ranches.
 
 
 6
 Ultimately 80 percent of the land was sold by Porter Realty, an independent brokerage that worked for petitioners from 1974 until 1978. Porter Realty conducted a nationwide telephone campaign, using scripts approved by petitioners and mailed information packets supplied by petitioners to prospective purchasers.
 
 
 7
 An "Agents Agreement" with Porter Realty authorized it to solicit sales but forbade both acceptance of sales offers and representations inconsistent with materials supplied by petitioners. Porter Realty distributed an oil map[1] which depicted ownership of parcels near GVA and GVA II by oil interests. Petitioners hired Jeffrey Elfont to contact customers who purchased from Porter Realty and to retract all oil development representations made by Porter Realty. Kritzler testified that he cancelled the contracts and refunded the money of persons who purchased the land as an investment in reliance upon Porter Realty's oil development representations. Some but not all such buyers were contacted.
 
 
 8
 The FTC lodged a three count complaint contending that petitioners engaged in unfair and deceptive practices in violation of Sec. 5 of the Federal Trade Commission Act. The complaint alleged that petitioners (1) misrepresented that the parcels were a good investment involving little or no financial risk and deceptively failed to disclose material information regarding their financial risk, (2) misrepresented that the land was suitable for residential use, farming, and ranching, and deceptively failed to disclose material information regarding the suitability of the properties for these purposes, and (3) sold land that was of little or no value for the represented purposes and unfairly retained proceeds from the sales. An administrative law judge (ALJ) dismissed the complaint, the Commission reversed and issued a cease and desist order, from which petitioners timely appeal.
 
 ANALYSIS
 Standard of Review
 
 9
 The Commission's factual findings are conclusive if supported by evidence sufficient to permit a reasonable mind to accept the Commission's conclusion. Litton Industries, Inc. v. FTC, 676 F.2d 364, 368 (9th Cir.1982).
 
 I. The Deception Standard
 
 10
 The ALJ dismissed the complaint under the deception standard that "any advertising representation that has the tendency and capacity to mislead or deceive a prospective purchaser is an unfair and deceptive practice." The Commission applied a "new" standard: "[T]he Commission will find deception if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."[2]
 
 
 11
 Petitioners contend that application of the new deception standard violated the Administrative Procedures Act (APA), 5 U.S.C. Sec. 554(b) which requires that they be "timely informed of the matters of fact and law asserted." 5 U.S.C. Sec. 554(b)(3). Petitioners also contend that their due process rights were violated because the Commission "based its decision on a new theory of deception that was significantly different from the one litigated by the parties."
 
 
 12
 The purpose of the notice requirement in the Administrative Procedures Act is satisfied, and there is no due process violation, if the party proceeded against "understood the issue" and "was afforded full opportunity" to justify his conduct. Golden Grain Macaroni Co. v. FTC, 472 F.2d 882, 885 (9th Cir.1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2730, 37 L.Ed.2d 144 (1973).[3]
 
 
 13
 Each of the three elements of the new standard challenged by petitioner imposes a greater burden of proof on the FTC to show a violation of Section 5. First, the FTC must show probable, not possible, deception ("likely to mislead," not "tendency and capacity to mislead"). Second, the FTC must show potential deception of "consumers acting reasonably in the circumstances," not just any consumers. Third, the new standard considers as material only deceptions that are likely to cause injury to a reasonable relying consumer, whereas the old standard reached deceptions that a consumer might have considered important, whether or not there was reliance.
 
 
 14
 The Commission reversed the ALJ's findings on a theory more narrow than, but completely subsumed in, the prior theory. All evidence relevant to the old theory was necessarily relevant to the new. We cannot accept petitioners' argument that a "substantially different standard was applied, to which [they] had no opportunity to respond." This is not a case in which it was "readily apparent that different defenses and proofs would be used in defending against ... two theories" of liability. Bendix Corp. v. FTC, 450 F.2d 534, 541 (6th Cir.1971). The Commission did not violate the APA or the petitioners' due process rights.
 
 II. Ex Parte Communications
 
 15
 Petitioners contend that the complaint should be dismissed because complaint counsel gave the Commission four written memoranda during adjudication of petitioners' case and was dilatory in placing copies in the public record.[4] The memoranda concerned consent agreement negotiations between the agency and petitioners' co-respondents, Porter Realty and Irvin Porter. Agency regulations explicitly permit internal communication concerning consent settlements. 16 C.F.R. Sec. 4.7(f) (1985). To the extent that such communication relates to a fact in issue in an ongoing adjudication, "such portion will be placed in the docket binder of the proceeding to which it pertains." Id. The regulations do not specify the time within which that must be done, but require that all adjudicative proceedings of the FTC be conducted "expeditiously." 16 C.F.R. Sec. 3.1 (1985). The proposed consent agreement and recommendations were forwarded to the Secretary on April 19, 1983, but were not placed on the record until August of 1984.
 
 
 16
 Ex parte communications do not void an agency decision. PATCO v. FLRA, 685 F.2d 547 (D.C.Cir.1982). The agency decision is voidable and the court will consider whether "the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency is obliged to protect." Id. at 564. Relevant considerations are the gravity of the ex parte communication, whether the communication may have influenced the decision, whether the party making the communication benefited from the decision, whether opposing parties knew of the communication and had an opportunity to rebut, and whether vacation and remand of the decision would serve a useful purpose. Id. The court is concerned primarily with the integrity of the process and the fairness of the result rather than adherence to mechanistic rules. Id.
 
 
 17
 Petitioners allegation must overcome a presumption of honesty and integrity on the part of the Commission, and thus a presumption that the decision rests on proper grounds. Porter County Chapter v. Nuclear Regulatory Commission, 606 F.2d 1363, 1371 (D.C.Cir.1979). The communications here were expressly permitted by agency regulations and disclosure was made to petitioners as required by the regulations. 16 C.F.R. Sec. 4.7 (1985). Although the disclosure was not prompt, petitioners had an opportunity to respond to the documents. The ex parte communications here did not invalidate the Commission's proceedings.
 
 III. Substantial Evidence
 
 18
 When the agency and ALJ agree, the appellate court will not reverse the ALJ's credibility findings unless they are "inherently incredible or patently unreasonable." NLRB v. Anthony Co., 557 F.2d 692, 695 (9th Cir.1977); United Association of Journeymen, Local Union No. 525 v. NLRB, 553 F.2d 1202, 1205 (9th Cir.1977).
 
 
 19
 When the agency and the ALJ disagree, findings of an ALJ are merely part of the record before the agency. NLRB v. Brooks Cameras, Inc., 691 F.2d 912, 915 (9th Cir.1982). The court's deference is to the agency determination, not that of the ALJ. Stamper v. Secretary of Agriculture, 722 F.2d 1483, 1486 (9th Cir.1984); Loomis Courier Service Inc. v. NLRB, 595 F.2d 491, 495 (9th Cir.1979).
 
 
 20
 Petitioners argue that the following Commission findings are based upon insufficient evidence and/or unwarranted reversals of the judge's credibility findings:
 
 
 21
 1. that petitioners' employees made oral representations concerning the land's investment potential;
 
 
 22
 2. that the land is not suitable for residential use, small-scale farming, or ranching;
 
 
 23
 3. that the land has little value for any of the represented uses;
 
 
 24
 4. that petitioners' brokers had actual and apparent authority to make representations concerning oil-related development,
 
 
 25
 5. that Gross and Kritzler personally participated in and approved of the unlawful practices.
 
 
 26
 Oral Reoresentations by In-House Staff (Count I)
 
 
 27
 In analyzing Count I, the ALJ considered whether petitioners had represented the land as a "risk-free" investment and found by a preponderance of the evidence that they had not. The Commission reversed, holding that Count I did not require proof of a representation that profits were guaranteed. The Commission concluded that the ALJ had failed to consider the "net impression communicated to consumers" through petitioners' written and oral representations
 
 
 28
 The Commission identified three types of misleading representations about the land as a good or low risk investment:
 
 
 29
 "(1) general assurances that land, and therefore this land in particular, is a good investment and a good way to make money;
 
 
 30
 (2) specific assurances that profits on this land could be realized in a short time frame, that purchasers could expect to double or triple their money, and that no loss would be suffered; and
 
 
 31
 (3) descriptions of oil and gas activity and other potential developments in the area, as well as recitals of residential, farming, and ranching uses for the land, that conveyed the representation that the land was a good investment".
 
 
 32
 The Commission based these findings on promotional materials composed by petitioners and upon the testimony of witnesses. The Commission's findings were not based upon redeterminations of the ALJ's credibility findings and are supported by substantial evidence.
 
 
 33
 Suitability of the Land for Use as a Homesite, Farm, or Ranch (Count II)
 
 
 34
 The Commission, ALJ, and the parties agree that petitioners represented the land as suitable for use as a homesite, farm, or ranch.
 
 
 35
 The ALJ found those representations not deceptive because there were "no insurmountable obstacles" to residential use, "sufficient information" was provided about utility costs, and the evidence showed the feasibility of limited farm/ranch use.
 
 
 36
 In contrast, the Commission considered petitioners' failure to disclose substantial development costs in light of their earlier representations of suitability. The Commission found the representations deceptive because they inaccurately portrayed the practical and economic suitability of the land for these uses. The Commission concluded that petitioners "failure to disclose material information needed to correct misimpressions [about development costs] amount[ed] to a misleading practice."
 
 
 37
 The Commission based these findings on petitioners' acknowledgment, sales materials, and testimony of salesmen and consumers. The Commission also considered evidence about the cost of utilities, the availability of financing, the local market for produce, and the land required for cattle grazing.
 
 
 38
 The Commission's findings that the representations inaccurately portrayed the land's suitability and failed to disclose development costs, are supported by substantial evidence.
 
 Value of the Land (Count III)
 
 39
 The Commission reversed the ALJ's findings on value because the ALJ failed to make findings as to the land's actual market value. The ALJ declined to resolve conflicting testimony as to the value in concluding that the land was not "of little or no value." The Commission found that the land's high cost relative to market value, the "steep development costs," and the risks and limitations attendant to the proposed uses supported its conclusion that the land had little or no value as an investment.
 
 
 40
 The Commission based its findings in part on the testimony of complaint counsel's expert, Mr. Compere. Although the Commission conceded that the methodologies of both Compere and petitioners' expert were flawed, it accepted Compere's testimony because his valuations properly considered resale values and satisfactorily resolved discrepancies as to prices paid for similarly-sized parcels.
 
 
 41
 Compere's qualifications as an expert were not challenged by petitioners. Compere's testimony constitutes substantial evidence which supports the Commission's finding as to the land's investment value.
 
 
 42
 The Commission correctly held that property sold here for a price many times greater than its market value did not meet any sensible definition of investment value.
 
 
 43
 Apparent and Actual Authority of Petitioners' Broker
 
 
 44
 The Commission found that Porter Realty had both actual and apparent authority to make representations on investment value. A principal is bound by the acts of his salesperson if those acts are within the scope of his apparent or actual authority, unless the third party has actual notice that the acts are unauthorized. Goodman v. F.T.C., 244 F.2d 584, 592 (9th Cir.1957).
 
 
 45
 The ALJ found no apparent authority because "there must come a point where a respondent is permitted to exculpate himself.... [T]he actions taken by respondents to correct the situation ... were sufficient to place respondents beyond the reach of those cases [making them liable for actions of agent]." The Commission reversed, finding that furnishing sales materials for public distribution to Porter Realty, which identified petitioners as sellers, clothed Porter Realty with apparent authority to make investment and other representations.
 
 
 46
 The Commission considered the telephone scripts and written sales material furnished by petitioners to Porter Realty and the testimony of customers. The Commission noted the close business relationship between petitioners and Porter Realty, which included almost daily telephone conferences. On the basis of this continual communication the Commission rejected the argument that petitioners didn't know of the oil map use.
 
 
 47
 The Commission found that petitioners' remedial actions, contacting persons who purchased from Porter Realty, instituting a refund policy, and providing "disclaimers" in the fact sheets and sales agreements, were not sufficient to limit Porter Realty's apparent authority.
 
 
 48
 The Commission found also that Porter Realty had actual authority through the Agents Agreement to make investment-related representations not in conflict with written material produced by petitioners. Porter Realty was free to make representations on subjects not mentioned in the written material. The Commission found that Porter Realty made misrepresentations about the land that were not in conflict with the Agents Agreement, especially the investment value and the extent and significance of nearby oil and gas activity.
 
 
 49
 We conclude that substantial evidence supports the Commission's findings that petitioner violated Section 5 through the misrepresentations committed by agents whom they vested with actual and apparent authority. This finding was not based on a reversal of the ALJ's credibility determinations.
 
 Individual Liability
 
 50
 The FTC order bound Gross and Kritzler in their individual capacities. Gross and Kritzler argue that the Commission did not have substantial evidence on which to base its finding that they participated in and approved of the unlawful practices and that the Commission substituted its credibility findings for those of the administrative law judge. Gross and Kritzler selected the properties to be purchased and the prices to be charged, decided upon the deceptive content, promotional materials, commercials, and sales contracts. They prepared or approved television and radio advertisements containing deceptive representations.
 
 
 51
 The ALJ did not explicitly address individual responsibility. Because he found no violation of the FTC Act, he did not apportion responsibility. Therefore, he made no credibility findings to which the agency or this court should defer. Substantial evidence supports the Commission's finding of individual responsibility based on their managerial and policy-making responsibilities.
 
 IV. The Order
 
 52
 Petitioners argue that the Commission's order, which required disclosure to past as well as future buyers, exceeds the agency's authority.
 
 
 53
 The Commission has broad remedial power and a remedial order should be upheld if reasonably related to the unlawful practices found to exist. Chrysler Corp. v. FTC, 561 F.2d 357, 364 (D.C.Cir.1977).
 
 
 54
 Orders requiring affirmative disclosures and corrective advertising are clearly within the agency's power. Amrep Corp. v. FTC, 768 F.2d 1171, 1180 (10th Cir.1985). These corrective orders do not constitute retroactive private relief. Heater v. FTC, 503 F.2d 321 (9th Cir.1974). Nor is this an instance of enjoining past violations which are unlikely to recur. FTC v. Evans Products Co., 775 F.2d 1084 (9th Cir.1985).
 
 CONCLUSION
 
 55
 The Commission is AFFIRMED.
 
 
 
 [1]
 The Commission found that petitioners acquiesced in Porter's distribution of the map to prospective purchasers
 
 
 [2]
 The new standard became binding on the FTC when it was adopted in Cliffdale Associates, Inc., 3 CCH Trade Reg.Rep. p 22,137 (1984); Amrep Corp. v. FTC, 768 F.2d 1171, 1179 (10th Cir.1985)
 
 
 [3]
 In Golden Grain Macaroni Company v. FTC, we held that neither the APA nor due process was violated when the complaint charged defendants with violation of Sec. 2 of the Sherman Act (monopolization and attempt to monopolize), but they were found to have violated Sec. 7 of the Clayton Act (making an acquisition where the effect may substantially lessen competition or may tend to create monopoly). We found that petitioner had understood the issue and was afforded an opportunity to defend where, despite obvious differences between Sherman Act and Clayton Act standards, the same facts were pertinent to both theories
 But when each theory is based upon different assertions of fact, the Commission violates the APA if it finds respondent liable under a theory not raised before the ALJ. Bendix Corporation v. FTC, 450 F.2d 534, 541 (6th Cir.1971).
 
 
 [4]
 The ex parte communications consist of a staff memorandum (Buenger/Perkins II), a transmittal memorandum from the Deputy Director of the Bureau of Consumer Protection, and a one sentence transmittal memorandum from the Deputy Director
 Petitioners also count Buenger/Perkins I, a document reviewed by the Bureau of Consumer Protection but never transmitted to the Commission. Buenger/Perkins I also concerns the settlement agreement and, like the other memoranda, was a "protected" communication under agency rules.