**UNITED REALTY CORP., a Florida Corp., assignee of Porter Realty, Inc., a Florida dissolved corporation, Plaintiff-Appellee,**

**v.**

**GREEN VALLEY ACRES, INC., II, a Texas Corporation; Green Valley Acres, Inc., a Texas Corp.; and Southwest Sunsites, Inc., etc., Defendants-Appellants.**

No. 85–5565.

United States Court of Appeals, Eleventh Circuit.

July 9, 1986.

Glenn A. Mitchell, Stein, Mitchell & Mezines, Washington, D.C., for defendants-appellants.

Ainslee R. Ferdie, Jeffrey Solomon, Coral Gables, Fla., for plaintiff-appellee.

Before CLARK, Circuit Judge, HENDERSON,* and WISDOM,** Senior Circuit Judges.

### CORRECTED

HENDERSON, Senior Circuit Judge:

This appeal arose out of a diversity action by a real estate broker against three land developers for commissions due under a real estate brokerage contract. After a bench trial, the United States District Court for the Southern District of Florida rendered judgment in favor of the broker. We affirm.

The appellants, Southwest Sunsites, Inc., Green Valley Acres, Inc. and Green Valley Acres, Inc., II (the developers), are three Texas corporations formed by California principals to sell undeveloped rural land in west Texas. In the mid-1970s the developers entered into a nonexclusive brokerage agreement with Porter Realty, Inc. (Porter Realty), a Florida corporation since dissolved, to market lots to the public. Porter Realty's owner, Irvin Porter, is also the owner of United Realty Corp. (United Realty), the appellee. United Realty is successor to Porter Realty's rights under the brokerage agreement.

Under the terms of the agreement, Porter Realty was obligated to contact potential buyers by telephone from its Florida office. If the contacted individual was interested in purchasing a lot, Porter Realty mailed a purchase agreement along with printed information compiled by Porter Realty and the developers. The printed material prepared by both Porter Realty and the developers mentioned the fact that the land was located near producing oil wells. The purchaser returned the executed purchase agreement to the developers and also made monthly payments of the purchase price directly to the developers. The developers then paid Porter Realty a commission from the payments. Porter Realty received no commission in the event of a cancellation of the sale, and the developers set off commissions previously paid on a cancelled purchase against future commissions. The agreement also required Porter Realty to obtain the developers' approval for all promotional materials used in its sales efforts and to conduct these efforts within the requirements of law.

This business relationship at first proved highly successful for both parties. Between 1974 and 1978, Porter Realty secured approximately 2600 sales contracts worth $12,000,000.00 and in turn received $2,000,000.00 in commissions. In 1977, however, the developers began receiving complaints from purchasers about Porter Realty's sales methods. These complaints alleged that Porter Realty had misrepresented the short-term investment value of the land and its potential for oil production. The developers contacted Porter about these complaints and Porter promised to curtail the criticized activities. Porter also terminated several sales agents as a result of these complaints. The developers contend that despite these assurances, Porter Realty continued making misrepresentations to potential buyers. They also claim that they were forced to cancel an unspecified number of sales contracts as a result of Porter Realty's conduct. The developers terminated the brokerage contract in March of 1978, but continued to pay previ-

---

* *See* Rule 3(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable John Minor Wisdom, Senior U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

ously earned commissions as payment became due.

These misrepresentations also caught the attention of the Federal Trade Commission (FTC). In March of 1980, the FTC obtained a temporary restraining order in a federal district court in Texas freezing the developers' assets pending an anticipated lawsuit for consumer restitution under the FTC Act, 15 U.S.C. § 57b. *See Federal Trade Commission v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir.), *cert. denied*, 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982). It is undisputed that Porter Realty and the developers agreed to suspend commission payments during the life of the temporary restraining order. The developers maintain that the agreed suspension was to remain in effect pending a final resolution of the FTC proceedings. As such, they refused to resume commission payments when the temporary restraining order was dissolved on May 19, 1980.

On April 29, 1980, the FTC issued an administrative complaint charging Porter Realty and the developers with unfair and deceptive trade practices in violation of the FTC Act, 15 U.S.C. § 45(a). In 1981 Porter Realty entered into a consent decree with the FTC, which contained no finding of liability. The complaint against the developers proceeded to a hearing. On July 29, 1982, an administrative law judge (ALJ) found that Porter Realty had misrepresented the value of the developers' land, but that the developers were not responsible for these misrepresentations because they had taken sufficient preventive action. On January 31, 1985, the FTC, adopting a new standard of proof for deception, modified the ALJ's order and found the developers liable for FTC Act violations. The FTC assigned fault to the developers because of their own conduct in supplying incomplete and misleading sales material and because they had sanctioned the actions of their agent, Porter Realty. The developers appealed to the Ninth Circuit Court of Appeals. That court recently upheld the order of the FTC. *See Southwest Sunsites, Inc. v. Federal Trade Commission*, 785 F.2d 1431 (9th Cir.1986). The FTC has reserved the right to seek consumer restitution from the developers once the order becomes final.

On February 9, 1983, United Realty, the successor of Porter Realty, filed suit in the Circuit Court of Dade County, Florida to recover commissions that had become due since the federal district court in Texas imposed the temporary restraining order. The developers removed the case to the United States District Court for the Southern District of Florida. They also filed a counterclaim for damages for breach of contract. After a bench trial, the district court granted judgment to United Realty for $77,187.01, plus interest. The developers now appeal to this court, assigning three grounds for reversal.

The developers' primary argument is that the district court should not have enforced the brokerage agreement because that contract was tainted by Porter Realty's unlawful conduct. Florida adheres to the common-law doctrine that courts, as a matter of public policy, should refuse to enforce contracts that have an unlawful objective. The former Fifth Circuit Court of Appeals applied this defense in a series of cases involving an illegal boxing contract. In *Inter-Continental Promotions, Inc. v. MacDonald*, 367 F.2d 293, 296 (5th Cir.1966),[1] *cert. denied*, 393 U.S. 834, 89 S.Ct. 105, 21 L.Ed.2d 104 (1968), the court first noted that "[t]here is no doubt that a contract to perform an illegal act is void and will not be enforced in Florida courts." The court then held that a Florida statute required that boxing matches have a nonprofit organization as sponsor and remanded the case for the district court to determine if the match actually had such a sponsor. On another appeal after remand, the appellate court held that the match lacked an appropriate sponsor and, consequently,

---

**1.** In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981.

found the contract unlawful and unenforceable. "The evidence shows that the parties, pursuant to their contract, accomplished an unlawful purpose by virtue of an apparent subterfuge. Under the circumstances, the law will leave the parties where it finds them, and no relief shall be granted because of the dominant public interest." *Inter-Continental Promotions, Inc. v. Miami Beach First National Bank,* 441 F.2d 1356, 1361 (5th Cir.), *cert. denied,* 404 U.S. 850, 92 S.Ct. 85, 30 L.Ed.2d 89 (1971). *See also Kulla v. E.F. Hutton & Co.,* 426 So.2d 1055, 1057 (Fla.Dist.Ct.App. 1983).

Courts apply the illegality defense even if both parties to the contract were aware of its illegal purpose. This is so because courts should be free from entanglement with an illegal agreement. The defense is not meant to benefit the opposing party. Consequently, a court will deny enforcement even if such denial will in fact benefit an entity that was party to the illegal agreement. *See Nathan v. Tenna Corp.,* 560 F.2d 761, 763 (7th Cir.1977); *Inter-Continental Promotions, Inc. v. Miami Beach First National Bank,* 441 F.2d at 1360–61. However, a court may elect to grant some relief despite the unlawful nature of the contract if the party seeking enforcement is less guilty of moral fault than the opposing party and if nonenforcement would create an unjust result under the circumstances. *See Singleton v. Foreman,* 435 F.2d 962, 969 (5th Cir.1970); *Kulla v. E.F. Hutton & Co.,* 426 So.2d at 1057 n. 1.

Although we are aware of no controlling Florida cases, the illegality defense clearly applies to lawful contracts that are performed in a significantly unlawful manner. Perhaps the clearest exposition on this subject is contained in one of the major contracts treatises:

[I]f the performance actually rendered by the plaintiff is something in itself forbidden by law, neither the fact that the bargain was in such general terms as to cover either an illegal performance or a lawful performance, nor that both parties originally had no intention to have the performance unlawful, will justify recovery on the bargain if the illegality is serious or constitutes more than an incidental part of the performance.

15 S. Williston, *A Treatise on the Law of Contracts* § 1761 (3d ed. 1972). The Second Circuit Court of Appeals took a similar view in *Bankers Trust Co. v. Litton Systems, Inc.,* 599 F.2d 488, 491 (2d Cir.1979): "Although the contract being sued upon is not itself illegal, ... a contract would be unenforceable in a suit brought by the wrongdoer if there were a direct connection between the illegal bribe and the obligation sued upon...." *See also Nathan v. Tenna Corp.,* 560 F.2d at 764; *cf. Goldenberg v. Bache & Co.,* 270 F.2d 675, 681 (5th Cir.1959); 6A A. Corbin, *Contracts* § 1522 (1962).

■ The illegal performance aspect forms the basis of the developers' argument in this case. The district court apparently found that Porter Realty's conduct was not sufficiently criminal, immoral or outrageous to justify the extreme penalty of nonenforcement. We agree with that determination. The brokerage contract and the land sale plan both were legal. The only illegality was in the method employed to effectuate some of the sales and that fault was the responsibility, at least in part, of the developers. Moreover, the developers have failed to establish the quantitative or qualitative scope of Porter Realty's misrepresentations. During the trial, the developers introduced an estimate based on an informal telephone survey that Porter Realty made misrepresentations to fifty or sixty percent of land purchasers. The developers, however, failed to substantiate this estimate, to demonstrate the extent of the misrepresentations in each case, or to prove the number of purchasers who cancelled their contracts as a result of Porter Realty's actions. Finally, we note that none of the unlawful conduct was criminal in nature. *Cf. Bankers Trust Co. v. Litton Systems, Inc.,* 599 F.2d at 490 (commercial bribery); *Nathan v. Tenna Corp.,* 560 F.2d at 762–63 (mail fraud and commercial bribery). From these facts, we cannot

say that the developers met their burden of proving the criminal, immoral or outrageous nature of Porter Realty's conduct. As such, the district court was correct in upholding the brokerage contract.

The developers next argue that Porter Realty agreed to modify the agreement and suspend commissions until the final resolution of the FTC proceedings. The district court rejected this contention, holding that Porter Realty agreed to suspend commissions only during the existence of the temporary restraining order. Since the temporary restraining order was dissolved on May 19, 1980, the district court held that the developers were obligated to resume payments on that date.

The district court's findings concerning the agreement to suspend commissions are factual in nature and will not be reversed by this court unless the findings are clearly erroneous. Fed.R.Civ.P. 52(a). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528 (1985).

The developers point to Porter's deposition as evidence that he agreed to cancel the existing commission agreement. In his deposition, Porter stated that the developers advised him that they were withholding all commissions until the completion of the FTC proceedings and that he "acquiesced" to this suspension "because there was nothing I could do." He testified at the trial, however, that he had not agreed to end the payments, but that there was no way for him to force collection of the commissions. The developers also offered testimony by their principals that Porter had agreed to suspend commissions and renegotiate once the FTC proceedings were final.

■ The evidence is conflicting as to the duration of the commission suspension. Under these circumstances, it was within the province of the district court, as trier of fact, to make credibility choices. The district court chose to believe Porter's testimony. After reviewing the record as a whole, we cannot say that this determination was clearly erroneous.

■ Finally, the developers urge that they are entitled to damages for Porter Realty's own breach of contract. They claim that Porter Realty breached the brokerage contract and its fiduciary duty when it made the unauthorized and unlawful misrepresentations to land purchasers. The district court, the FTC and the Ninth Circuit Court of Appeals all decided that Porter Realty's misrepresentations were either implicitly or explicitly authorized by the developers. *See Southwest Sunsites, Inc. v. Federal Trade Commission*, 785 F.2d 1431, 1438–39 (9th Cir.1986). We agree with this conclusion. The record discloses that the printed material prepared by the developers mentioned the alleged investment value and oil potential of the land. Moreover, the developers kept in close contact with Porter Realty and were aware of its business practices. They also continued to receive the benefits of the sales contracts after they admittedly had notice of Porter Realty's conduct. These facts clearly support the district court's finding that the developers vested Porter Realty with sufficient authority for its actions. Consequently, Porter Realty did not breach the contract and is entitled to recover the commissions due.

The judgment of the district court is AFFIRMED.