761 So.2d 1256 (2000)
MILLENNIUM COMMUNICATIONS & FULFILLMENT, INC. & Advanced Marketing and Research, Inc., Appellants,
v.
OFFICE OF the ATTORNEY GENERAL, DEPARTMENT OF LEGAL AFFAIRS, STATE OF FLORIDA, Appellee.
No. 3D99-1423.
District Court of Appeal of Florida, Third District.
July 19, 2000.
*1257 Law Offices of R. Stuart Huff and Mark L. Mallios, Coral Gables; Andrew Cove (Hollywood), for appellants.
Robert A. Butterworth, Attorney General and Sylvie Perez-Posner, Assistant Attorney General, for appellee.
Before SCHWARTZ, C.J., and GREEN and FLETCHER, JJ.
GREEN, J.
Millennium Communications, Inc. and Advanced Marketing and Research, Inc. (collectively "Millennium") appeal a temporary injunction entered in favor of the Department of Legal Affairs ("Department") pursuant to The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), section 501.207(1)(b), Florida Statutes (1997).[1] For the reasons which follow, we reverse.

I

BACKGROUND
Millennium is a Florida corporation which is licensed by a Nevada company, Continental Consumer Credit Corporation ("Continental") to advertise and promote Continental's Advantage credit card program in all states except Florida, Kansas, Wisconsin and North Carolina. This credit card program is a mechanism by which people with poor credit histories can restore their credit worthiness. Essentially, the Continental program allows these consumers to obtain a Continental Advantage card, which can then be used to purchase items from Continental's catalogs. Once these consumers purchase the merchandise from these catalogs and timely pay for the same, Continental makes favorable reports to credit bureaus. This then puts these consumers in a favorable position to apply for other credit cards, including bank cards such as Visa and MasterCard.

*1258 THE COMPLAINT

On December 4, 1998, the Department filed a complaint against Millennium seeking an injunction, civil penalties and other statutory relief afforded under FDUTPA. The complaint alleged, among other things, that Millennium, through the use of a postcard mailed around the country, advertised and promoted the ability of consumers with bad credit to obtain a guaranteed credit card.[2] It was further alleged that once the consumers received the postcard and called the "800" number listed on the postcard, certain representations were made to them either directly or by implication which lead the consumers to conclude that they would be receiving either a Visa or MasterCard type credit card.[3]
The Department further alleged that after Millennium collected the $129.00 fee, the consumers received their Advantage credit card, along with a package of other materials, including the catalogs and the information on the Orlando trip mentioned in the postcard. These materials disclosed that: (1) consumers cannot automatically qualify for or receive a Visa or Master-Card; and that (2) consumers only become eligible to apply for the Visa or MasterCard by fulfilling "a few basic requirements," to wit:
a) Ordering only from the catalogs received in their packages, as the Advantage credit card can only be used to purchased merchandise in those catalogs;
b) paying a down payment on that merchandise of 50% of the total amount (minimum order from each catalog is $50) upon ordering said merchandise;
c) paying an additional 8% or the total amount for shipping and handling;
d) consumers must charge and pay for $500 (excluding down payments, shipping and handling, vouchers or merchandise gift certificates) on the Continental Advantage credit card, and make six months of timely payments, in order to have their accounts favorably reported to the credit bureau;
e) electronic and certain jewelry items are not available until a satisfactory payment history is established;
f) an additional down payment may be required on certain items;

*1259 g) if consumers pay the down payment with a personal check, their order will not even be processed for 21 days;
h) while the application for the Visa or MasterCard is free of charge, the card itself, if approved, requires the payment of a separate fee over and above the $129.00 fee already paid to Millennium by the consumers; and
i) Millennium does not refund the processing fees.[4]
Finally, the complaint alleged that few, if any, consumers actually received a Visa or MasterCard as a result of purchasing the Advantage card, since few met the aforestated minimum requirements. Based upon its allegations, the Department sought to enjoin Millennium, its agents, employees, or persons who act on its behalf, from engaging in further acts and practices alleged therein; reimbursement to all consumers; and to assess Millennium civil penalties in the amount of $10,000 for each act or practice found to be in violation of chapter 501, part II, Florida Statutes (1997) pursuant to section 501.2075, Florida Statutes (1997).

PROCEDURAL HISTORY
In response to the complaint, Millennium moved to dismiss the complaint on the grounds, inter alia, that FDUTPA, chapter 501 was inapplicable to its transactions in the absence of any allegations that Millennium had marketed its products to Florida residents or that any Florida consumers had been injured or affected by its alleged activities. The Department then filed a motion for temporary injunction, incorporating all of the allegations contained in the complaint and alleging that if the defendants were not enjoined, the number of consumers aggrieved by Millennium's deceptive acts would increase. The Department further stated that it had no remedy at law to protect the consuming public.
Millennium's motion to dismiss was heard and denied. Prior to the hearing on the state's motion for temporary injunction, Millennium moved for judgment on the pleadings for the Department's failure to join Continental as an indispensable party to this proceeding. The Department countered that this action was not an attack upon the terms and conditions of Continental's program per se, but instead was aimed solely at Millennium's failure to adequately disclose the terms and conditions of Continental's program.
The hearing on both the motion for judgment on the pleadings and motion for temporary injunction was then held. At the outset of the hearing, the parties made certain stipulations, namely, that Millennium advertises to people outside the state of Florida; the Department had received 24 complaints from consumers residing outside the state of Florida; and that of the consumers requesting refunds, 1400-1500 consumers had received complete refunds. At the conclusion of the hearing, the trial court denied Millennium's motion for judgment on the pleadings, finding that Continental was not an indispensable party to this proceeding. The court granted the Department's motion for temporary injunction expressly finding the postcard to be deceptive and ordered Millennium to cease and desist from using it. In entering the temporary injunction, the court also ordered the parties to meet with a special master in an effort to draft a revised postcard, subject to the Department's approval, that would fairly disclose to consumers what they would receive and to place a disclaimer on what they would not receive. Further, the new card was to include a street address on the postcard rather than the post office box address previously utilized and to have the sales pitch script conform to the agreed upon postcard. This appeal followed.
*1260 Millennium essentially contends on this appeal that the trial court erred in granting the temporary injunction because FDUTPA has no applicability to consumers residing outside of the state of Florida. Alternatively, Millennium argues that even if this chapter is found to have applicability to its subject activities, the temporary injunction was still error because its postcard advertisement was not deceptive or misleading. Lastly, Millennium asserts that even if the injunctive order is affirmed, that the part of the order requiring Millennium to revise the postcard, subject to the Department's approval, was error because it constituted an improper delegation of judicial authority to the executive branch.

II
At the outset, we note that injunctive relief is an extraordinary remedy to preserve the status quo, pending a final hearing, which ordinarily should not be granted absent a showing of irreparable harm; a clear legal right to the relief requested or substantial likelihood of success on the merits; an inadequate remedy at law; and considerations of the public interests. See Naegele Outdoor Advertising Co., Inc. v. City of Jacksonville, 659 So.2d 1046, 1047 (Fla.1995); Storer Communications, Inc. v. State, Dept. of Legal Affairs, 591 So.2d 238, 239-40 (Fla. 4th DCA 1991); Harvey v. Wittenberg, 384 So.2d 940, 941 (Fla. 3d DCA 1980); see also Escudero v. Hasbun, 689 So.2d 1144, 1146 (Fla. 3d DCA 1997). However, because section 501.207(1)(b) expressly authorizes the Department to seek injunctive relief on behalf of the state, the Department does not have to establish irreparable harm, lack of an adequate legal remedy or public interest. See Storer; Harvey; see also U.S. v. Sene X Eleemosynary Corp., Inc., 479 F.Supp. 970 (S.D.Fla.1979). The Department's sole burden at a temporary injunction hearing under FDUTPA is to establish that it has a clear legal right to a temporary injunction. Moreover, on appeal, we will not reverse an order granting a temporary injunction unless it is found to be a clear abuse of discretion. See Wise v. Schmidek, 649 So.2d 336 (Fla. 3d DCA 1995); Richard v. Behavioral Healthcare Options, Inc., 647 So.2d 976 (Fla. 2d DCA 1994). We conclude that FDUTPA does have applicability to the challenged transactions, but that the Department did not meet its burden to establish a clear legal right to a temporary injunction. Accordingly, the lower court clearly abused its discretion in entering the order under review.

CHAPTER 501 AND ITS APPLICABILITY TO NON-RESIDENTS
The Florida legislature enacted FDUTPA in 1973 to protect consumers against commercial wrongdoing and it is patterned after the Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 45 et seq. See David J. Federbush, The Unexplored Territory of Unfairness in Florida's Deceptive and Unfairness in Florida's Deceptive and Unfair Trade Practices Act, 73 Fla. B.J. 26 (May 1999) ("Federbush"). In fact, FDUTPA specifically provides that in construing its provisions, due considerations and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to the FTC Act. See § 501.204(2), Fla. Stat. (1997); Rollins, Inc. v. Heller, 454 So.2d 580, 584 (Fla. 3d DCA 1984). FDUTPA makes unlawful, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. See § 501.204(1).
Millennium first argues that FDUTPA has no applicability to its commercial transactions with non-Florida residents. Since Continental's Advantage credit card program was never advertised or promoted to any Florida residents, Millennium asserts that it could not be held statutorily liable under FDUTPA. We disagree and conclude that FDUTPA does *1261 have applicability to the commercial transactions between Florida corporations and non-resident consumers.
Our analysis of this issue properly begins with the language utilized in Chapter 501 itself as that is the primary indicator of legislative intent, the acknowledged polestar of statutory construction. See Acosta v. Richter, 671 So.2d 149, 153 (Fla. 1996); Aetna Cas. & Surety Co. v. Huntington Nat'l Bank, 609 So.2d 1315, 1317 (Fla.1992). See also Federbush, The Unclear Scope of Unconscionability in FDUTPA, 74 Fla. B.J. 49 (August 2000). The expressed and avowed purpose of the act is to promote the following policies:
(1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices.
(2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.
(3) To make state consumer protection and enforcement consistent with established practices of federal law relating to consumer protection.
See § 501.202, Fla. Stat. (1997); see also Macias v. HBC of Florida, Inc., 694 So.2d 88 (Fla. 3d DCA 1997). Moreover, in furtherance of these policies, the act defines certain terms which are illuminating to our discussion, to wit:
"Interested party or person" means any person affected by a violation of this part or any person affected by an order of the enforcing authority.
* * * *
"Consumer" means an individual; child, by and through its parent or legal guardian; firm; association; joint venture; partnership; estate; trust syndicate; fiduciary; corporation; or any other group or combination.
* * * *
"Trade or commerce" means the advertising, soliciting, providing offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any other article, commodity, or thing of value, wherever situated. "Trade of commerce" shall include the conduct of any trade or commerce, however, denominated, including any nonprofit or not-for-profit person or activity.
See §§ 501.203(6), (7), (8), Fla. Stat. (1997) (emphasis added).
Conspicuously absent from this chapter, as the Department correctly observes, is any language which purports to confine the provisions of FDUTPA or limit the Department's enforcement authority to commercial transactions involving only Florida residents. In the absence of any such limiting language, we decline to construe chapter 501 as limiting the Department's enforcement authority to commercial transactions involving only Florida. See Messmer v. Teacher's Ins. Co., 588 So.2d 610, 612 (Fla. 5th DCA 1991) (plain meaning of word should apply in the absence of language altering or limiting the plain meaning); Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) ("courts of this state are without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms ...").
Millennium cites us to Coastal Physician Services of Broward County, Inc. v. Ortiz, 764 So.2d 7 (Fla. 4th DCA 1999) wherein the fourth district granted a petition for certiorari in an action brought pursuant to FDUTPA and the Consumer Collection Practices Act, §§ 559.55-785, Fla. Stat. (1997), and quashed a discovery order, in part, to limit the discovery request solely to Florida residents. The court, citing to sections 501.203(4) and 559.55(6) concluded that both of these acts are for the protection of in-state consumers from either in-state or out-of-state debt collectors. With due respect to our sister court, we are not persuaded by this holding as it applies to FDUTPA because *1262 as we have earlier noted, there are no geographical or residential restrictions contained in the express language of section 501.202. Moreover, in its later decision of Renaissance Cruises, Inc. v. Glassman, 738 So.2d 436 (Fla. 4th DCA 1999), wherein the same court found that FDUTPA had applicability to both in-state and out-of-state residents in a class action, it appears to us that the fourth district has receded, sub silentio, from its earlier holding in Ortiz.
Millennium also cites us to several decisions from other states and federal courts which have declined to apply state consumer statutes to commercial transactions conducted outside of the state. See, e.g., Bass v. Hendrix, 931 F.Supp. 523, 536 (S.D.Tex. 1996) (plaintiff's claim pursuant to Texas statute rejected because plaintiff was a Connecticut resident and any misrepresentations therefore "occurred outside of Texas"); Goodrich v. E.F. Hutton Group, Inc., 542 A.2d 1200, 1203 (Del.Ch.1988) (claim based upon Delaware statute dismissed where there were "no allegations that any Delaware customers received" any offending material); Att'y Gen. of Md. v. Dickson, 717 F.Supp. 1090, 1102 (D.Md.1989) (claim based on Maryland statute for rolling back odometer inside Maryland "insufficient to constitute violation within scope of act" where no statement was mailed to a Maryland resident). These cases are distinguishable because the state statutes in question did contain language of limitation. See, e.g. Bass, 931 F.Supp. at 535 ("consumer" is defined under the Texas Deceptive Trade Practices Act as "an individual, partnership, corporation, ... of this state..."); Goodrich, 542 A.2d at 1202 (the enunciated purpose of the Delaware Consumer Fraud Act is to "... protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part as wholly within this state."); Att'y Gen. of Md., 717 F.Supp. at 1100 (§ 24.303 of the Maryland Consumer Protection Act enumerates an extensive list of deceptive practices and common to each practice is the notion that a deceptive statement is communicated to a consumer in the state).
As we read FDUTPA, it seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of this state without limitation. Therefore, where the allegations in this case reflect that the offending conduct occurred entirely within this state, we can discern no legislative intent for the Department to be precluded from taking corrective measures under FDUTPA even where those persons affected by the conduct reside outside of the state.[5]

WHETHER THE ACTS COMPLAINED OF WERE DECEPTIVE
Having concluded that the provisions of FDUTPA are applicable to offending conduct *1263 occurring inside Florida to non-Florida residents, we must now consider Millennium's next issue on appealwhether the trial court correctly determined that Millennium's postcard was deceptive under FDUTPA and therefore, whether the Department established a clear, legal right to a temporary injunction. Violations under FDUTPA may be based, among other things, upon any rules promulgated pursuant to the Federal Trace Commission Act, 15 U.S.C. §§ 41 et seq. and/or the standards of unfairness and deception set forth and interpreted by the Federal Trade Commission or the federal courts. See § 501.203(3)(a), (b). Since FDUTPA is the state counterpart to the Federal Trade Commission Act, in deciding whether an act or practice may be deemed deceptive, we must give due consideration and great weight to the interpretations made by the Federal Trade Commission and the federal courts. See § 501.204(2); see also Urling v. Helms Exterminators, Inc., 468 So.2d 451 (Fla. 1st DCA 1985); Rollins v. Heller, 454 So.2d at 584.
Both Millennium and the Department agree that the new Federal Trade Commission standard for deceptive advertising was enunciated in Southwest Sunsites, Inc. v. Federal Trade Commission, 785 F.2d 1431 (9th Cir.1986). There, the court stated that "[t]he commission will find deception if there is a representation, omission or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." 785 F.2d at 1434-35. Further, the court noted that each of these three elements of the new standard imposes a greater burden of proof upon the FTC to show a violation of section 5 under the FTC act:
First, the FTC must show probable, not possible, deception ("likely to mislead," not "tendency and capacity to mislead"). Second, the FTC must show potential deception of "consumers acting reasonably in the circumstances, not just and consumers. Third, the new standard considers as material only deceptions that are likely to cause injury to a reasonable relying consumer, whereas the old standard reached deceptions that a consumer might have considered important, whether or not there was reliance."
Id. at 1435.
Moreover, Millennium points out that in 1994, Congress amended 15 U.S.C. § 45 by adding subsection "n" to provide that:
The Commissions shall have no authority under this section or section 57a of this title to declare unlawful an act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.
In the instant case, the Department doesn't contend that Continental's Advantage credit card program itself is somehow violative of FDUTPA. Rather, it claims that the postcard utilized by Millennium to advertise or promote this credit card program is deceptive for its failure to disclose certain aspects of the program to the consumer, namely, that the credit card referred to on the postcard is not a Visa or MasterCard or that the consumers were not eligible to receive a bank credit card until they have successfully fulfilled certain unspecified requirements with the Advantage credit card program.[6] When we measure Millennium's postcard advertisement against the FTC's more stringent standard *1264 for deceptiveness enunciated in Southwest Sunsites, we conclude that the Department failed to establish that these omissions were likely to mislead consumers acting reasonably under the circumstances. Therefore, we find the order granting the temporary injunction to be a clear abuse of discretion and reverse the same.
The recipient of Millennium's postcard is advised that he or she has been selected to receive an unspecified credit card with a guaranteed unsecured credit limit of $4,000, regardless of the recipient's past credit history. Although we are mindful of the fact that deception may be accomplished by innuendo rather than outright false statements, see Regina Corporation v. Federal Trade Commission, 322 F.2d 765, 768 (3rd Cir.1963), we can discern nothing from the language contained on the postcard which would likely to mislead a consumer acting reasonably under the circumstances to conclude that the credit card to which the card refers is a Visa or MasterCard credit card as urged by the Department. Indeed, we agree with Millennium that any such conclusion on the part of a consumer with past credit problems would be pure "wishful thinking." It is undisputed that the assertions on the postcard were factual in that all of the recipients of this postcard were in fact eligible to receive a credit card, albeit an Advantage credit card, with a guaranteed unsecured credit limit of $4,000. For this reason, the cases relied upon by the Department are wholly distinguishable. See, e.g. People of the State of N.Y. v. Financial Servcs. Network USA, 930 F.Supp. 865 (W.D.N.Y.1996) (ad mailed to consumers represented that for a fee, they were pre-approved for a $30,000 credit line and "debt consolidation" services in the form of the "Resource card" found patently misleading and deceptive where only after paying the up-front fee did the consumers learn that the "Resource Card" is not a credit card and that the line of credit was actually an investment offer of a finders fee for locating prospective mortgage holders interested in selling a mortgage debt to the business entity at a discount); Federal Trade Commission v. Amer. Standard Credit Systems, 874 F.Supp. 1080 (C.D.Cal.1994) (advertisement stating "anyone can qualify for Visa and MasterCard... Bad Credit? No Credit? No Problem. Make the Call and Get the Credit you Deserve Now!" found deceptive for its failure to also disclose that consumers can only obtain a Visa or MasterCard by paying a processing fee and making a minimum deposit of $300. Since the consumer learned of these requirements only after paying $9.95 to call a "900" number, the omissions were likely to mislead since a reasonable consumer would not have likely made the call had he or she known of them in advance); Removatron Int'l Corp. v. Federal Trade Commission, 884 F.2d 1489 (1st Cir.1989) (where the common sense met impression of petitioner's advertising claims was that their machine could remove hair permanently and that this claim was supported by scientific evidence which in fact was not true for all people 100% of the time, the evidence was sufficient to support the commission's finding that the ad was deceptive under § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45). Moreover, once the recipients of the postcard telephoned the toll-free telephone number to inquire, they were specifically told that the credit to which the advertisement referred was an Advantage credit card to purchase items out of the Advantage catalog.
Thus, for the foregoing reasons, we reverse the order granting the temporary injunction. Given our disposition of this issue, Millennium's remaining issue on appeal has been rendered moot.
Reversed.
NOTES
[1] Millennium also appeals an order denying its motion to dismiss the state's complaint. As the Department correctly notes, the denial of a motion to dismiss is not an enumerated appealable interlocutory order under Florida Rule of Appellate Procedure 9.130. Moreover, this issue is moot in any event given the fact that the merits of this motion are subsumed by our discussion of the merits of the temporary injunction order.
[2] The postcard stated as follows:

CONGRATULATIONS!
YOU HAVE BEEN SELECTED TO RECEIVE A
CREDIT CARD
with an unsecured credit limit of
$4,000 Guaranteed
regardless of your past credit history!
Plus a FREE 3 Days & 2 Nights in Magical Orlando, FL
Special Promotion Offer!
You are guaranteed your very own credit card with an initial credit limit of $4,000 regardless of your past credit history, plus a limited time only, completely FREE,
3 Days and 2 Nights in Magical Orlando, FL.
For Immediate Activation and Issuance of your Credit Card Now ...
Hours: 9:A.M. to 9:P.M. Monday through Friday*Saturdays 10:A.M. to 6:P.M. (eastern time)
1-800-722-8055
CALL NOW ... THIS IS A LIMITED TIME OFFER!
Notice: Free trip allows a companion and two children. Credit Card applicants must be 18 years or older.
Credit limit may go up to $7500. This is a special promotion offer from First Capital Finance and it can be withdrawn at any time.
[3] According to the complaint, the following representations were made on the telephone:

(1) Consumers could obtain an unsecured credit card with a $4,000 credit limit;
(2) once consumers gave Millennium's salesperson their name and other information, authorization was requested through a computer to approve the consumers for the credit card. This was followed by their approval to receive the Advantage Credit Card used by Continental Consumer Credit Corporation;
(3) consumers could charge the purchase of products from catalogs provided by Millennium and Continental;
(4) consumers would receive an application for a Visa or MasterCard, and that 92% of their cardholders were approved for those credit cards;
(5) the "credit card fee" of $129.00 was automatically debited to consumers' checking accounts.
[4] The Department concedes that this allegation was based upon complaints received at the time of the filing of the complaint, but the record evidence subsequently disclosed that Millennium had always had a refund policy.
[5] We note that other jurisdictions have similarly declined to restrict the state's consumer protection laws to state residents. See, e.g. Perry v. Household Retail Servcs., Inc., 953 F.Supp. 1370 (M.D.Ala.1996) (the Illinois Consumer Fraud and Deceptive Business Practices Act is not limited solely to the protection of Illinois residents); Cirone-Shadow v. Union Nissan of Waukegan, 1995 WL 238680 (N.D.Ill. April 20, 1995) (finding that the Illinois Consumer Fraud Act contains no limitation and prohibits fraud in the conduct of any trade or commerce); Pacamor Bearings, Inc. v. Minebea Co., Ltd., 918 F.Supp. 491, 504 (D.N.H.1996) ("That this lawsuit pertains to fraudulent conduct allegedly known and perpetuated by a business within the borders of the state satisfies the statutory locality prerequisite notwithstanding the limited amount of direct sales to New Hampshire customers. It is the "offending conduct" that must occur within the statethe "unfair method of competition or any unfair or deceptive act or practice" in trade or commerce not the actual sale."); Brown v. Market Dev., Inc., 41 Ohio Misc. 57, 322 N.E.2d 367, 368 (1974) (where the court concluded that the intention of the Ohio Consumer Sales Practices Act was to "prohibit [and to provide civil remedies to enforce the prohibition of] deceptive and unconscionable acts and practices by Ohio suppliers in connection with consumer transactions irrespective of the location of the consumer, whether within or without Ohio").
[6] Specifically, the Department points out that the postcard omitted the following key facts: the amount of purchases consumers must make from the catalogs, the amount of the down payment, the cost of shipping and handling, the minimum order, and the limited products available from the catalogs.